MAINE SUPREME JUDICIAL COURT                          Reporter of Decisions
Decision:      2020 ME 113
Docket:        Cum-20-227
Argued:        September 15, 2020
Decided:       September 22, 2020

Panel:         MEAD, GORMAN, JABAR, HUMPHREY, and HORTON, JJ.

DAVID A. JONES et al.

v.

SECRETARY OF STATE et al.

PER CURIAM

[¶1]  Intervenors The Committee for Ranked Choice Voting and three individuals (collectively, "Committee") and the Secretary of State appeal from a judgment of the Superior Court (Cumberland County, *McKeon, J.*) vacating the Secretary of State's determination that an inadequate number of valid signatures had been submitted to place on the ballot a people's veto of An Act to Implement Ranked-choice Voting for Presidential Primary and General Elections in Maine, P.L. 2019, ch. 539.  *See* Me. Const. art. IV, pt. 3, § 17.  Upon a petition for review of the Secretary of State's decision filed by David A. Jones, Jonathan Kinney, and Joshua Morris (collectively, "Jones"), the court concluded that it was unconstitutional for the State to require that every circulator who collected signatures be registered to vote in the circulator's municipality of

residence at the time of circulation. On the limited record presented to us, we conclude that Jones has not demonstrated that the requirement in Maine's Constitution and statutes that a circulator be a registered voter in the circulator's municipality of residence when collecting signatures violates the First Amendment. Accordingly, we vacate the court's judgment.[1]

## I. BACKGROUND

[¶2] On July 15, 2020, the Secretary of State issued a written determination of the validity of a petition for the people's veto of An Act to Implement Ranked-choice Voting for Presidential Primary and General Elections in Maine, P.L. 2019, ch. 539.[2] He concluded that an insufficient number of valid signatures had been submitted in support of the petition.[3] *See* Me. Const. art. IV, pt. 3, § 17, cl. 1 (requiring "not . . . less than 10% of the total vote for Governor cast in the last gubernatorial election preceding the filing of such petition" for a people's veto to be placed on the ballot). For the petition to

---

[1] We need not, and do not, reach the parties' additional arguments regarding alternative bases for invalidating certain signatures. Nor do we entertain Jones's argument that the Superior Court erred in affirming the Secretary of State's determination that certain signatures submitted to the registrar in Freeport were invalid. Jones did not file a cross-appeal and therefore cannot raise claims of error. *See Johnson v. Home Depot USA, Inc.*, 2014 ME 140, ¶ 5 n.1, 106 A.3d 401.

[2] The signed petitions had been submitted to the Secretary of State on June 15, 2020.

[3] Because the Maine Constitution defines the term "written petition" as "*one or more petitions* written or printed," the term "petition" describes both the individual papers bearing signatures and the collection of those individual papers that constitutes the proponent's request to the Secretary of State that an act of the Legislature be "referred to the people." Me. Const. art. IV, pt. 3, § 17, cl. 1; Me. Const. art. IV, pt. 3, § 20 (emphasis added).

be valid, 63,067 signatures were necessary, and the Secretary of State determined that only 61,334 of the signatures submitted were valid.

[¶3]  On July 27, 2020, Jones filed a petition for review of the Secretary of State's final agency action in the Superior Court.  *See* 21-A M.R.S. § 905(2) (2020); M.R. Civ. P. 80C.  The next day, Jones filed a motion requesting that the court remand the matter for the Secretary of State to take additional evidence to resolve multiple factual discrepancies.  The Committee moved to intervene.

[¶4]  On August 3, the court (*McKeon, J.*) granted the motion to intervene and held a status conference.  By agreement of the parties, the court granted the motion to remand and ordered the Secretary of State to take additional evidence and reconsider his decision, with a supplement to his determination and the administrative record to be filed by August 11, and also ordered a schedule of briefing that would conclude on August 21.[4]

[¶5]  On August 12, 2020, the Secretary of State issued an amended determination of the validity of the petition in which he concluded, among other things, that the signatures submitted from some signature collectors were not valid because those collectors had not been registered voters on the voting lists

---

[4]  The court later modified the order based on the parties' agreement to allow the Secretary of State an additional day to file his materials.

4

of their municipalities of residence at the time that they collected signatures.[5]

*See* Me. Const. art. IV, pt. 3, § 20; 21-A M.R.S. § 903-A (2020); *id.* § 903-A(4)(C).

The Secretary of State concluded that some other signatures that he had originally determined to be invalid were valid but still determined that there were insufficient valid signatures—only 61,292—for the people's veto to be placed on the ballot.

[¶6]  On August 21, after receiving briefs, the court held a telephonic hearing and remanded the matter to the Secretary of State to complete an investigation related to one town office by noon on August 24, with briefs to be submitted from the other parties on the same day.  The court also ordered that the parties would have until August 24 to submit briefs on the effect of *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999), on the validity of the signatures that the Secretary of State had disqualified because the signature collectors were not registered as voters in their municipalities of residence at the time they collected signatures.

---

[5]  The Secretary of State determined that one of the two people who circulated the petitions that are now in dispute had changed her residence for purposes of her driver's license in the late summer of 2019 but had not registered to vote in that municipality until after collecting petition signatures. Both of the individuals swore by affidavit that they were registered Maine voters; one averred that she had voted in 2016 and 2018 elections, and the other averred that she was an "active Maine voter" who had been registered since 1999.

[¶7] The parties submitted all required materials on August 24, and the Secretary of State additionally filed a supplement to his amended determination of the validity of the petition for a people's veto. The Secretary of State still concluded—although by a smaller margin—that there were not enough valid signatures for the people's veto to be placed on the ballot. He determined that only 62,101 of the signatures submitted were valid—966 signatures short of the necessary 63,067.

[¶8] On August 24, 2020, the court entered a judgment vacating the Secretary of State's determination that insufficient signatures had been collected. The court concluded that *Buckley* rendered the requirement that a circulator be a registered voter at the time he or she collected signatures to be a violation of the First Amendment of the United States Constitution and held that 988 signatures had been improperly invalidated on the basis of the circulator's registration status.

[¶9] Both the Secretary of State and the Committee appealed. *See* 21-A M.R.S. § 905(3) (2020); M.R. App. P. 2A, 2B. The Committee moved in the Superior Court for "clarification" of whether an automatic stay was in place. Jones opposed the motion, and the court ordered that it "would take no action on [the] motion." The Secretary of State and the Committee then filed motions with us to stay the execution of the Superior Court's judgment. We dismissed

the motions as moot after concluding that Rule 62(e) imposed an automatic stay on the Superior Court's judgment pending appeal. *See Jones v. Sec'y of State*, 2020 ME 111, --- A.3d ---. The merits of the appeals are now before us.

## II. DISCUSSION

[¶10] In this opinion, we consider (A) whether Maine's Constitution and statutes require circulators to be registered voters in the municipality where they reside at the time they collect signatures on a people's veto petition and (B) if they do so require, whether, on the record presented, the registration requirement violated the First Amendment to the United States Constitution.

A. Constitutional and Statutory Requirement of Circulator Registration

[¶11] We interpret Maine's Constitution and statutes de novo as questions of law. *See Avangrid Networks, Inc. v. Sec'y of State*, 2020 ME 109, ¶ 13, --- A.3d ---; *Reed v. Sec'y of State*, 2020 ME 57, ¶ 14, --- A.3d ---. We will interpret the constitutional or statutory provision according to its plain meaning if the language is unambiguous. *See Avangrid Networks, Inc.*, 2020 ME 109, ¶ 14, --- A.3d ---; *Reed*, 2020 ME 57, ¶ 14, --- A.3d ---.

[¶12] As to the constitution, "[i]f the provision is ambiguous, we [will] determine the meaning by examining the purpose and history surrounding the provision." *Avangrid Networks, Inc.*, ¶ 14, --- A.3d --- (quotation marks omitted). With respect to the language of a statute within the expertise of an

administering agency, however, if the provision is ambiguous, meaning that it is "reasonably susceptible to different interpretations," we defer to the agency's reasonable construction. *Reed*, 2020 ME 57, ¶ 14, --- A.3d --- (quotation marks omitted). We have held before that the Secretary of State "is the constitutional officer entrusted with administering—and having expertise in—the laws pertaining to the direct initiative process." *Id.* ¶ 18. As we do with respect to the direct initiative process, we accord deference to the Secretary of State's reasonable interpretation of an ambiguous statute governing the people's veto process. *See id.*

[¶13] "'[C]irculator' means a person who solicits signatures for written petitions, and who must be a resident of this State and whose name must appear on the voting list of the city, town or plantation of the circulator's residence as qualified to vote for Governor." Me. Const. art. IV, pt. 3. § 20. A person thus does not meet the definition of a "circulator" for purposes of the Maine Constitution unless and until that person's name "appear[s] on the voting list" in the municipality where the person resides as qualified to vote for Governor. *Id.*

[¶14] By statute, petitions "may be circulated by any Maine resident who is a registered voter acting as a circulator of a petition." 21-A M.R.S. § 903-A. A circulator is specifically required to execute an affidavit swearing, among

other things, "[t]hat the circulator was a resident of the State and a registered voter in the State *at the time of circulating* the petition." *Id.* § 903-A(4)(C) (emphasis added). To vote, a person must "have established and maintain a voting residence in [a] municipality" *and* be registered to vote *in that municipality*. 21-A M.R.S. §§ 111(3), (4), 112 (2020). Only a municipal registrar can determine that a person is qualified to register as a voter in the municipality, *see* 21-A M.R.S. § 121 (2020), and a person's residency in that municipality is a necessary qualification for registration, *see id.* § 111(3), (4), 112. "A change of residence is made only by the act of removal, joined with the intent to remain in another place. *A person can have only one residence at any given time.*" *Id.* § 112(2) (emphasis added).

[¶15] In sum, the Maine Constitution requires that a circulator be a resident "whose name must appear on the voting list of the city, town or plantation of the circulator's residence as qualified to vote for Governor," Me. Const. art. IV, pt. 3. § 20; and the statutes require that a person be a resident of a municipality to be registered to vote, *see* 21-A M.R.S. §§ 111(3), (4), 112(2), 121; *see also* 21-A M.R.S. §§ 161(2-A), 162-A (2020) (providing for registrars' maintenance of voter registration information including address changes). These provisions are unambiguous.

[¶16]  Even if the Maine Constitution were ambiguous, however, we would reach the same conclusion based on the history surrounding the adoption of the definition of "circulator."  Effective November 24, 1975, the Maine Constitution was amended by legislative resolution approved by the electorate to add the definition of "circulator" to article IV, part 3, section 20.  *See* Const. Res. 1975, ch. 2, *approved in* 1975.  The Statement of Fact included with the proposed resolution provided: "The signature-gathering process is improved and tightened in several ways.  Any *registered voter*, not just a person who is one of the signers of a petition, may circulate petitions."  L.D. 188, Statement of Fact (107th Legis. 1975) (emphasis added).  The Legislature's Committee on the Judiciary had recommended the change: "The committee . . . felt the circulator should be a registered voter.  This was accomplished by adding to this section a definition of a circulator requiring him or her to be a resident of the state and a registered voter." Report of the Judiciary Committee on the Initiative and Referendum Process 14 (Dec. 2, 1974).  These sources clearly indicate that the Legislature contemplated that circulators would *be* registered voters when they circulated petitions—not that they would become registered voters after circulation but before submitting the petitions.  The Secretary of State's interpretation of section 903-A is consistent with the legislative history of article IV, part 3, section 20, and, if we discerned any

ambiguity in the statute, we would defer to his reasonable construction of it. *See Reed*, 2020 ME 57, ¶ 14, --- A.3d ---.

[¶17]  Because we conclude that the Maine Constitution and statutes require a petition circulator to be registered in the municipality of residence when circulating a petition, we must next consider whether the court erred in concluding that this constitutional and statutory requirement violated the First Amendment.

B.    First Amendment

[¶18]   A person challenging the constitutionality of a legislative enactment "bears a heavy burden of proving unconstitutionality[,] since all acts of the Legislature are presumed constitutional."  *Goggin v. State Tax Assessor*, 2018 ME 111, ¶ 20, 191 A.3d 341 (quotation marks omitted).  To overcome the presumption of constitutionality, the party challenging a law must "demonstrate convincingly" that the law and the Constitution conflict.  *Id.* (quotation marks omitted).  "[A]ll reasonable doubts must be resolved in favor of the constitutionality" of the enactment.  *Id.* (quotation marks omitted).

[¶19]  The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . ."  U.S. Const. amend. I.  The freedom of speech "secured by the First Amendment against abridgment by the United States, [is] among the fundamental personal rights and liberties which are

secured to all persons by the Fourteenth Amendment against abridgment by a State." *Meyer v. Grant*, 486 U.S. 414, 420 (1988).

1. Level of Scrutiny Applicable to Ballot-Access Regulations

[¶20] The circulation of petitions for a ballot initiative such as a people's veto constitutes "core political speech." *See Buckley*, 525 U.S. at 186 (quotation marks omitted); *Me. Taxpayers Action Network v. Sec'y of State*, 2002 ME 64, ¶ 8, 795 A.2d 75 (quotation marks omitted). Although state regulations affecting core political speech must ordinarily "be narrowly tailored to carry out a compelling state purpose," *Me. Taxpayers Action Network*, 2002 ME 64, ¶ 8, 795 A.2d 75 (quotation marks omitted), application of the strict scrutiny standard has not always been required in cases involving the regulation of ballot access, including cases involving the regulation of petition circulation, because "'there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'" *Buckley*, 525 U.S. at 187 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)); *see Burdick v. Takushi*, 504 U.S. 428, 430, 433 (1992) (reviewing a Hawaii regulation prohibiting write-in voting); *Anderson v. Celebrezze*, 460 U.S. 780, 782-83, 788 (1983) (reviewing an Ohio regulation imposing an early filing deadline for petitions to nominate an independent presidential candidate). Unlike with other regulations of core political speech, an important—but not

necessarily compelling—governmental interest in regulating ballot access may outweigh the burden placed on even core political speech because of the need for fairness and order in the democratic process. *See Buckley*, 525 U.S. at 187; *Burdick*, 504 U.S. at 433-34.

[¶21] To ensure fairness and order, the United States Supreme Court has therefore adopted a specific framework for cases involving the regulation of ballot access that does not always require application of the strict scrutiny standard. *See Arizonans for Second Chances, Rehab., & Pub. Safety v. Hobbs*, No. CV-20-0098-SA, 2020 Ariz. LEXIS 279, at *24, --- P.3d --- (Sept. 4, 2020) (citing *Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 789). This approach is in contrast to the mandatory application of the strict scrutiny standard in reviewing restrictions on core political speech—or content-based restrictions on speech—that do not regulate ballot access. *Cf. FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 455-56, 464-65 (2007) (applying strict scrutiny to review a statute prohibiting certain corporate broadcasts to the electorate naming political candidates); *Cent. Me. Power Co. v. Pub. Utils. Comm'n*, 1999 ME 119, ¶¶ 18-23, 734 A.2d 1120 (applying strict scrutiny to review restrictions on the content of an electric transmission-and-distribution facility's consumer education materials). When a statute "does not control the mechanics of the electoral process" and "is a regulation of pure speech," the ballot-access

framework will not apply. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 344-45 (1995).

[¶22]  Thus, unlike in *Mowles v. Commission on Governmental Ethics & Election Practices*, 2008 ME 160, ¶¶ 1, 10-31, 958 A.2d 897, where we applied strict scrutiny to review restrictions on the "pure speech" of campaign advertisements,[6] here we are reviewing a regulation regarding petition circulation—a ballot-access regulation pertaining to the "mechanics of the electoral process." *McIntyre*, 514 U.S. at 345; *see Buckley*, 525 U.S. at 186-87; *Burdick*, 504 U.S. at 433-34; *Anderson*, 460 U.S. at 789.  As we stated in *Mowles*, we ordinarily determine "whether the speech being regulated is core political speech," and apply strict scrutiny if it is.  *Mowles*, 2008 ME 160, ¶¶ 15-17, 958 A.2d 897.  Ballot-access regulations such as regulations of petition circulation, although regulating core political speech, *see Buckley*, 525 U.S. at 186; *Me. Taxpayers Action Network*, 2002 ME 64, ¶ 8, 795 A.2d 75, require us to undertake a further inquiry to determine the appropriate level of scrutiny.  *See Buckley*, 525 U.S. at 186-87; *Burdick*, 504 U.S. at 433-34; *Anderson*, 460 U.S. at 789.

---

    [6] We concluded in *Mowles* that the regulations were subject to strict scrutiny both because they regulated core political speech and because they placed content-based restrictions on that speech. *See Mowles v. Comm'n on Governmental Ethics & Election Practices*, 2008 ME 160, ¶¶ 18-19, 958 A.2d 897.

[¶23]  Specifically, pursuant to the framework adopted by the Supreme Court, to determine whether a ballot-access regulation governing the "mechanics of the electoral process," *McIntyre*, 514 U.S. at 345, violates the United States Constitution, a court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.  It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Anderson*, 460 U.S. at 789.  The court must both "determine the legitimacy and strength of each of those interests" and "consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.*

[¶24]  When First Amendment rights "are subjected to severe restrictions, [a] regulation must be narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (quotation marks omitted).  In contrast, "when a state election law provision imposes only reasonable, nondiscriminatory restrictions" on First Amendment rights, "the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.* (quotation marks omitted); *see also Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358-59 (1997).  As we have stated, "there is no litmus test for determining whether an election regulation imposes an

impermissible burden on free speech, and states are accorded considerable leeway in the regulation of the initiative process in order to promote their legitimate state purposes." *Me. Taxpayers Action Network*, 2002 ME 64, ¶ 8, 795 A.2d 75; *see also Buckley*, 525 U.S. at 192.

[¶25] We applied the analysis set forth by the Supreme Court in *Anderson* and *Burdick* in *Maine Taxpayers Action Network*:

> We agree with the Secretary, then, that requiring circulators to correctly identify themselves in their oath and affidavit is narrowly tailored to carry out the state's *reasonable* interest in locating circulators within or without the state's borders. *See, e.g.*, *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S. Ct. 2059, 119 L. Ed. 2d 245 (1992) (stating that when "a state election law provision imposes only *'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters*, 'the State's important regulatory interests are generally sufficient to justify' the restrictions" (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788, 103 S. Ct. 1564, 75 L. Ed. 2d 547 (1983)).

2002 ME 64, ¶ 20, 795 A.2d 75 (emphasis added).

2.    Courts' Consideration of Circulator Registration Requirements

[¶26]  The Supreme Court applied the *Anderson/Burdick* test in 1999 to determine whether a registration requirement for petition circulators violated the First Amendment.[7]  *See Buckley*, 525 U.S. at 193 (citing *Timmons*, 520 U.S. at

---

[7] The Court noted that its opinion "is entirely in keeping with the now-settled approach that state regulations impos[ing] severe burdens on speech . . . [must] be narrowly tailored to serve a compelling state interest," though it did not indicate that it was applying that standard, and Justice Thomas concurred in the judgment but opined that strict scrutiny should have been applied. *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 192 n.12 (1999); *id.* at 206-09 (Thomas, J., dissenting).

358 (summarizing the *Anderson/Burdick* test)). Specifically, the Court considered whether the State of Colorado's concerns warranted the burden on First Amendment rights that arose from a statutory requirement that initiative circulators be registered voters. *Id.* The Court held that Colorado's statutory requirement violated the First Amendment. *See Buckley*, 525 U.S. at 192-97.

[¶27] The Court reached this holding after a trial at which an election official testified that, although there were 1,900,000 registered voters in Colorado, at least 400,000 eligible people—more than 17 percent of all eligible voters—were not registered. *Id.* at 193.[8] The Court concluded that the government had not presented "impelling cause" to require circulators to register to vote to exercise their First Amendment rights by circulating petitions. *Id.* at 197. The court held that the government's asserted interests in ensuring that circulators are not breaking the law and would be amenable to the subpoena power were insufficient grounds for curtailing First Amendment rights. *Id.* at 195-97. The Court considered in its analysis that, "*given the uncontested numbers*," the registration requirement "decrease[d] the pool of

---

Justice Thomas further opined that assessing the severity of burdens on core political speech to determine the necessary level of scrutiny can lead to inconsistent results. *Id.* at 206-09 (Thomas, J., dissenting).

8 The Court noted that, given United States Census statistics, the numbers might be even higher. *Buckley*, 525 U.S. at 193 n.15.

potential circulators" and limited the number of voices that could convey the message in favor of the petition. *Id.* at 194-95 (emphasis added). The Court specifically relied on testimony of some of those eligible to vote that they had chosen not to register as a form of protest. *Id.* at 196. As the Court's opinion demonstrates, the determination of the extent of an election regulation's burden on First Amendment rights is fact-intensive and may depend on broad statistical evidence and direct testimony from those eligible to vote. *See id.* at 192-97.

[¶28] After the Court's decision in *Buckley*, the United States District Court for the District of Maine considered Maine's requirement of voter registration to serve as a circulator. *See Initiative & Referendum Inst. v. Sec'y of State*, No. CIV. 98-104-B-C, 1999 WL 33117172 (Apr. 23, 1999). The court concluded that, because it was undisputed on summary judgment that 98.8 percent of those eligible to vote in Maine were registered, the imposition on First Amendment rights was minimal and the registration requirement, although less compelling than a simple residency requirement, was sufficiently compelling to justify the minor intrusion. *Id.* at *14-15.

[¶29] Unlike in *Buckley* and *Initiative & Reform Institute*, there has been no trial or summary judgment motion to generate evidence for the trial court's—or our—consideration here. *Cf. Buckley*, 525 U.S. at 192-97; *Initiative*

*& Referendum Inst.*, No. CIV. 98-104-B-C, 1999 WL 33117172, at *1.  Nor was any independent claim joined that could produce the kind of crucial evidence that is sometimes necessary to succeed in a First Amendment challenge in this context.  *Cf. Libertarian Party of Va. v. Judd*, 718 F.3d 308, 311-12 (4th Cir. 2013) (reviewing a summary judgment entered in an action brought pursuant to 42 U.S.C.S. § 1983 (LEXIS through Pub. L. No. 116-158)[9]); *Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1025-27 (10th Cir. 2008) (reviewing a judgment entered after an evidentiary hearing on a § 1983 claim).[10]  Such a record is vital, as the briefs of the parties demonstrate, with both the Secretary of State and Jones citing information from various sources concerning voter registration statistics and patterns and speculating about voter behavior given Maine's registration procedures.[11]

---

[9]  Although section 1983 was amended after the *Meyer* decision, that amendment does not affect our analysis here, and we cite to the current statute.  *See* Federal Courts Improvement Act of 1996, Pub. L. No. 104-317, § 309, 110 Stat. 3847, 3851.

[10]  We did consider a First Amendment challenge in an appeal from a Superior Court judgment entered in an appeal from the Secretary of State's decision in *Hart v. Sec'y of State*, 1998 ME 189, ¶¶ 1, 3-4, 715 A.2d 165, *cert. denied*, 525 U.S. 1139 (1999).  That decision predates *Buckley*, however, and the reasoning in *Buckley* persuades us that a factual record is often necessary to establish that a restriction on petition circulators violates the First Amendment.  *Buckley*, 525 U.S. at 192-97.

[11]  The Secretary of State indicates in his brief that 96 percent of those eligible to vote in Maine are registered.  Jones argues that this statistic is meaningless because that number does not represent the number of residents who are registered *in their current place of residence*.  The administrative record, however, does not contain statewide statistical evidence.

3.    Review of Maine's Requirement of Registration in the Municipality of Residence Before Circulation

[¶30]  Here, the court was ruling only on a Rule 80C petition for review of final agency action.  Thus, the record presented to the trial court is not extensive.  We proceed to consider, based on the limited record, whether Jones has shown that the requirement of registration in the municipality of residence *before* circulating petitions violates the First Amendment.  *See Goggin*, 2018 ME 111, ¶ 20, 191 A.3d 341.

a.    Character and Magnitude of the Burden on First Amendment Rights

[¶31]  On this record, we cannot conclude that "the character and magnitude of the asserted injury" to First Amendment rights, *Anderson*, 460 U.S. at 789, is severe.  The only statistics available in the administrative record pertain to this petition.  It is undisputed that less than two percent of the people who collected signatures for this specific petition were determined to have been unregistered at the time they collected signatures.  *Cf. Bernbeck v. Moore*, 126 F.3d 1114, 1116-17 (8th Cir. 1997) (holding that a circulator registration requirement violated the First Amendment when the trial court had found, based on undisputed evidence, that the number of individuals that petition organizers could find "was grossly insufficient to the task" (quotation marks omitted)).  Unlike some of those who testified in *Buckley*, 525 U.S. at 195-96,

the individual circulators whose petitions are in dispute here were not opposed to registering to vote and indeed became registered voters in their municipalities, albeit *after* they circulated the disputed petitions. Thus, although the *effect* of the signature collectors' failure to timely register in their new municipalities of residence may be severe in this case, we cannot say that the *burden* of the registration requirement on the exercise of petition supporters' First Amendment rights is severe either as applied in this case or more broadly in Maine. *See Me. Taxpayers Action Network*, 2002 ME 64, ¶ 29, 795 A.2d 75 (Dana, J., concurring) ("In the absence of any evidence to suggest that Maine's voter registration requirement presents a severe burden on the right of free speech, I would uphold the voter registration requirement . . . .").

b. Interests Put Forward by the State

[¶32] We turn next to "the precise interests put forward by the State as justifications" for the restrictions. *Anderson*, 460 U.S. at 789. The Secretary of State has argued that the regulation is designed to enable him to (1) locate circulators in the event that there are any questions of fraud or forgery, (2) subpoena circulators if necessary, and (3) determine residency in Maine as of the time of circulation without extensive factual inquiry. The argument as to the first two reasons is not germane to this case. As long as a circulator registers to vote in the circulator's municipality of residence at some point

before the petitions are submitted to the Secretary of State, *see* 21-A M.R.S. § 902 (2020), the Secretary of State would be able to locate and subpoena the circulator after receiving the petitions. *Cf. Me. Taxpayers Action Network*, 2002 ME 64, ¶ 29, 795 A.2d 75 (Dana, J., concurring) ("Maine's voter registration requirement serves a purpose of providing a convenient and administratively efficient means of identifying and locating circulators as part of the validation process, if necessary, or to investigate potential misconduct.").

[¶33]   This leaves only one other justification for the registration requirement—the determination of the circulator's Maine residency at the time the circulator collects signatures.  We determined in 1998 that the residency requirement itself does not violate the First Amendment.  *See* Me. Const. art. IV, pt. 3, § 20; *Hart v. Sec'y of State*, 1998 ME 189, ¶ 13, 715 A.2d 165, *cert. denied*, 525 U.S. 1139 (1999) ("[A]ny interference with proponents' right to unfettered political expression is justified by the State's compelling state interest in protecting the integrity of the initiative process, and the residency requirement set forth in the Maine Constitution is narrowly tailored to serve that interest.").[12]  Voter registration in Maine, which occurs at the local level, *see*

---

[12]  In *Hart*, which we decided before *Buckley*, we applied strict scrutiny without any citation to *Anderson* or *Burdick*. *Hart*, 1998 ME 189, ¶ 13, 715 A.2d 165.  The Supreme Court denied the petition for a writ of certiorari in that matter after publication of the *Buckley* decision. *See* 525 U.S. 1139 (1999).

21-A M.R.S. §§ 101, 121 (2020), is a simple[13] and, more importantly, *verifiable* way for the Secretary of State to determine a person's residency in Maine at the time of circulation of a petition—a consideration that was not discussed in *Buckley*, 525 U.S. at 195-97. The Secretary of State has access to municipal registrars and to the central voter registration system that they are required to maintain. *See* 21-A M.R.S. § 161(2-A); *see also Hart v. Gwadosky*, No. AP-98-30, 1998 Me. Super. LEXIS 130, *14 (May 15, 1998) ("Ensuring that a circulator is a resident is most easily accomplished by requiring that the [circulator] be a registered voter."). This efficient method of confirming circulator residency is vital to the expedited review process that the Secretary of State must undertake after the petitions are submitted. *See* 21-A M.R.S. § 905(1).

[¶34] The requirement that a circulator be registered in the circulator's municipality of residence while circulating a petition therefore imposes only "reasonable, nondiscriminatory restrictions" on the First Amendment rights of petition supporters for the purpose of ensuring compliance with the residency requirement of the Maine Constitution. *Burdick*, 504 U.S. at 434 (quotation

---

[13] The two-sided voter registration card used in Maine requires a Maine resident to provide the municipality with only basic information regarding eligibility to vote; party affiliation, if any; and residency and identifying information. *See* 21-A M.R.S. § 152(1) (2020) (specifying the contents of an application to register as a voter); *see also* 21-A M.R.S. § 111 (2020) (requiring, for a person to vote in a municipality, that the person be a United States citizen; be at least eighteen years of age; reside in the municipality; be registered to vote in that municipality; and, for party caucuses, conventions, or primaries, be a member of the party unless the party authorizes nonmembers to vote).

marks omitted). Thus, we conclude that the government's interest is sufficient to justify the restriction that the requirement places on petitioners' First Amendment rights. *See Burdick*, 504 U.S. at 434. The Superior Court erred in concluding, on the record before it, that Jones had satisfied his burden of overcoming the presumption of constitutionality. *Goggin*, 2018 ME 111, ¶ 20, 191 A.3d 341.

[¶35] We therefore vacate the judgment of the Superior Court in which it vacated the Secretary of State's decision as to the 988 signatures that it determined were valid. Because our decision results in a deficit in the number of signatures required for the people's veto to be placed on the ballot, we do not reach or consider the Committee's arguments regarding other signatures that it contends were improperly validated.

The entry is:

> Judgment of the Superior Court vacated. Remanded with instructions to affirm the Secretary of State's determinations that the 988 signatures contested on appeal to us are invalid and that therefore an inadequate number of valid signatures had been submitted to place the people's veto on the ballot. Mandate to issue immediately.

James G. Monteleone, Esq. (orally), and Matthew J. Saldaña, Esq., Bernstein Shur, Portland, for appellants The Committee for Ranked Choice Voting et al.

Aaron M. Frey, Attorney General, and Phyllis Gardiner, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellant Secretary of State

Patrick N. Strawbridge, Esq. (orally), Consovoy McCarthy PLLC, Boston, Massachusetts, for appellees David A. Jones, et al.

Cumberland County Superior Court docket number AP-20-16
FOR CLERK REFERENCE ONLY