MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2024 ME 22
Docket:        Ken-22-411
Argued:        October 4, 2023
Decided:       March 28, 2024

Panel:         STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.*

VIRGINIA PARKER et al.

v.

DEPARTMENT OF INLAND FISHERIES AND WILDLIFE

MEAD, J.

[¶1]  Virginia and Joel Parker appeal from a judgment of the Superior Court (Kennebec County, *Cashman, J.*) dismissing, pursuant to M.R. Civ. P. 12(b)(6), their complaint for declaratory judgment brought under 14 M.R.S. § 5954 (2023).  The Parkers' complaint alleged that Maine's longstanding Sunday hunting ban conflicts with the recently enacted right-to-food amendment to the Maine Constitution.  *See* Me. Const. art. I, § 25; 12 M.R.S. § 11205 (2023).

[¶2]  Taking the facts alleged in the complaint as true, *see Nadeau v. Frydrych*, 2014 ME 154, ¶ 5, 108 A.3d 1254, a de novo review of the legal

---

* Although Justice Jabar participated in the appeal, he retired before this opinion was certified.

2

sufficiency of the complaint, *see McCormick v. Crane*, 2012 ME 20, ¶ 5, 37 A.3d 295, establishes that the Parkers did sufficiently state a claim upon which relief can be granted because they presented a justiciable claim for a declaratory judgment. *See Nat'l Hearing Aid Ctrs., Inc. v. Smith*, 376 A.2d 456, 458-59 (Me. 1977). However, we are not persuaded by the Parkers' argument that the Sunday hunting ban has been rendered unconstitutional by the enactment of the amendment and, accordingly, we hold that the Sunday hunting ban does not conflict with the amendment.

## I. BACKGROUND

[¶3] Since the first codification of Maine's statutes, Maine has had some form of statutory restriction on Sunday hunting.[1] The current version of the

---

[1] The first form of a Sunday hunting ban appeared as part of a blanket restriction on activities that could be conducted on the Christian Sabbath—Sunday. *See* R.S. ch. 160, § 26 (1840) ("If any person shall, on the Lord's day, keep open his shop, workhouse, or warehouse, or travel or do any work, labor or business on that day, works of necessity or charity excepted, or use any sport, game or recreation, or be present at any dancing, public diversion, show or entertainment, encouraging the same, he shall be punished by a fine, not exceeding ten dollars."); R.S. ch. 124, § 20 (1857); R.S. ch. 124, § 20 (1871); *see also Nason v. Dinsmore*, 34 Me. 391, 392 (1852) ("[T]he Lord's day shall be construed to include the time between the midnight preceding, and the sunsetting of . . . . Sunday." (citing R.S. ch. 160, § 28 (1840))). Eventually, the Legislature enacted a statute explicitly and exclusively forbidding hunting on Sunday and acknowledging that it was an addition to the preexisting Sabbath restrictions. R.S. ch. 30, § 27 (1883) ("Sunday is a close time, on which it is not lawful to hunt, kill or destroy game or birds of any kind, under the penalties imposed therefor during other close times; but the penalties already imposed for violation of the Sunday laws are not repealed or diminished."); R.S. ch. 124, § 20 (1883); R.S. ch. 32, § 21 (1903); R.S. ch. 125, § 25, (1903); R.S. ch. 33, § 73 (1916); R.S. ch. 126, § 35 (1916); *see also State v. Sawyer*, 113 Me. 458, 459, 94 A. 886, 886 (Me. 1915) ("The respondent was tried . . . and found guilty of shooting two . . . wild ducks on Sunday, October 4, 1914, in violation of a provision of the fish and game laws of the State of Maine. . . . for Sunday is a closed time, when it is unlawful to hunt, kill, or destroy game or birds of any kind."). References to the older Sabbath restrictions were later removed from the ban. *See* R.S. ch. 38, § 44 (1930) ("Sunday is a

ban, 12 M.R.S. § 11205, was enacted and amended in 2003 and has not changed since. P.L. 2003, ch. 414, § A-2 (effective Sep. 13, 2003); P.L. 2003, ch. 655, § B-137 (effective July 30, 2004). The current statute provides that "[a] person may not . . . [h]unt wild animals or wild birds on Sunday." 12 M.R.S. § 11205.

[¶4] In January 2021, during the first regular session of the 130th Maine Legislature, Rep. Billy Bob Faulkingham brought a resolution to have an amendment to the Maine Constitution be proposed to the electorate at an upcoming election. L.D. 95 (130th Legis. 2021). After being considered by the Joint Standing Committee on Agriculture, Forestry and Conservation, the resolution was passed by both chambers and proposed as a referendum to Maine voters, who approved the amendment on November 2, 2021. L.D. 95 (130th Legis. 2021); Const. Res. 2021, ch. 1, *approved in* 2021. The amendment, enacted as Article I, section 25 of the Maine Constitution, provides:

> **Section 25. Right to Food.** All individuals have a natural, inherent and unalienable right to food, including the right to save and exchange seeds and the right to grow, raise, harvest, produce and consume the food of their own choosing for their own nourishment, sustenance, bodily health and well-being, as long as an individual does not commit trespassing, theft, poaching or other abuses of private property rights, public lands or natural resources in the harvesting, production or acquisition of food.

---

closed season, on which it is not lawful to hunt any wild animals or wild birds of any kind."); R.S. ch. 33, § 44 (1944); R.S. ch. 37, § 76 (1954); 12 M.R.S.A. § 2454 (1964).

Me. Const. art. I, § 25.

[¶5]  On April 27, 2022, the Parkers filed a one-count complaint in the Superior Court seeking a declaratory judgment pursuant to 14 M.R.S. § 5954. The complaint alleged the following facts: The Parkers are a married couple who live in Maine with their five children.  The Parkers acquire some of their food through hunting, but work and school commitments limit the days they can go hunting to weekends.  The ban further limits the days of the week that the Parkers can hunt together.  After the amendment was passed, Virginia Parker attempted to get permits for Sunday hunting, but the Department of Inland Fisheries and Wildlife told her that it could not issue the permits because of the ban.

[¶6]  The Parkers argued in their complaint that the ban has been rendered unconstitutional by the enactment of the amendment because the Maine Constitution now enshrines, according to the Parkers, "a right to harvest food through hunting."  Me. Const. art. I, § 25.  In their complaint, the Parkers recognized that the amendment "is not absolute" due to the explicit exceptions it also contains.  Me. Const. art. I, § 25 (providing that the right to food extends only "as long as an individual does not commit trespassing, theft, poaching or

other abuses of private property rights, public lands or natural resources in the harvesting, production or acquisition of food").

[¶7]  On June 14, 2022, the Department filed a motion to dismiss the complaint pursuant to M.R. Civ. P. 12(b)(6).  The Department argued in its motion that the ban was not in conflict with the amendment and that the Parkers had therefore failed to state a claim upon which relief could be granted. After the Parkers filed their opposition, and the Department its reply, the Superior Court issued a one-page order on December 5, 2022, finding that the Parkers failed to state a claim upon which relief could be granted and dismissing the complaint with prejudice.  The Parkers timely appealed.  M.R. App. P. 2B(c)(1).

## II.  DISCUSSION

[¶8]  In their appeal, the Parkers maintain their argument that the ban conflicts with the amendment and additionally argue that it was error for the trial court to dismiss their complaint because it adequately stated a claim upon which relief could be granted.

## A.    The Trial Court's Dismissal for Failure to State a Claim

[¶9]  The Superior Court found that the Parkers had failed to state a claim upon which relief could be granted and dismissed their complaint with

6

prejudice. The sole count of the Parkers' complaint sought relief under section 5954 of the Uniform Declaratory Judgments Act (the Act), 14 M.R.S. §§ 5951-5963 (2023), which provides:

> Any person . . . whose rights, status, or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status or other legal relations thereunder.

### 1. National Hearing Aid Centers, Inc. v. Smith

[¶10] In *National Hearing Aid Centers, Inc. v. Smith*, we considered a case with an identical procedural posture when a declaratory judgment action alleging that a statute conflicted with the Maine Constitution was dismissed by the trial court for failure to state a claim.[2]  376 A.2d at 457-59.  There, we analyzed the appropriateness of the dismissal by first looking at the justiciability of the complaint. *Id*. at 458-59.  We explained:

> Our declaratory judgment statute, although worded in general terms, is operative only in cases where a genuine controversy exists.  The existence of a controversy is essential in any case, for otherwise this Court would merely be giving an advisory opinion without authority of law.

> In determining justiciability we must ascertain whether the complaint alleged a claim of right justifying relief and whether a

---

[2] The Uniform Declaratory Judgments Act in effect when we considered *National Hearing Aid Centers, Inc. v. Smith* remains unchanged but for the modification of section 5956, *see* P.L. 2009, ch. 299, § A-2 (effective Sep. 13, 2009), which is not at issue here and was not at issue in *National Hearing Aid*.  *See* 14 M.R.S. §§ 5951-5963 (2023); 14 M.R.S. 5951-5963 (1964); *Nat'l Hearing Aid*, 376 A.2d 456, 458 (Me. 1977).

sufficiently substantial interest is asserted to warrant judicial protection.

*Id*. at 458 (citations and quotation marks omitted). Determining that the plaintiff alleged it had a right to conduct business freely, that it was subject to the statute at issue, and that the statute would infringe upon its ability to conduct business, *id*. at 458-59, we held:

We conclude that plaintiff's complaint alleges sufficient interest to give rise to standing. . . .

. . . The issue raised is ripe for decision.

It is apparent that a sufficiently justiciable claim was pleaded and that the [trial court] erred in dismissing the action. The plaintiff sought protection from an allegedly unreasonable exercise of the State's police power, buttressed by the assertion of sufficient interest . . . under the challenged statute. All the elements were present to give rise to a right to an adjudication of the claim presented.

*Id*. at 459 (citations omitted). Having decided that the claim was justiciable because it alleged a claim of right justifying relief and a sufficiently substantial interest to warrant judicial protection, we held that the trial court "improperly dismissed the action." *Id*. at 458-59.

[¶11] Accordingly, applying *National Hearing Aid*, if the Parkers' complaint alleged a justiciable claim, the trial court's dismissal with prejudice was error.

## 2. The Parkers Presented a Justiciable Complaint

[¶12] A declaratory judgment "may be either affirmative or negative in form and effect," and courts may issue them "whether or not further relief is or could be claimed." 14 M.R.S. § 5953. We have held that the Act "should be liberally construed to allow consideration of the rights of parties relative to the validity or interpretation of statutes." *Berry v. Daigle*, 322 A.2d 320, 325 (Me. 1974); *see also Annable v. Bd. of Env't Prot.*, 507 A.2d 592, 594-95 (Me. 1986). The Act may be invoked only "where there is a genuine controversy," and "a genuine controversy exists if a case is ripe for judicial consideration and action" because it satisfies two prongs: (1) the issues raised are fit for judicial review and (2) "hardship to the parties will result if the court withholds review." *Utsch v. Dep't of Env't Prot.*, 2024 ME 10, ¶ 24, --- A.3d --- (citations, alteration, and quotation marks omitted).

[¶13] Nevertheless, while the Act "expands the range of available relief, it does not relax the requirements of justiciability." *Berry*, 322 A.2d at 325. To establish justiciability for a declaratory judgment, a party must assert "a claim of right, buttressed by a sufficiently substantial interest to warrant judicial intervention." *Passamaquoddy Water Dist. v. City of Eastport*, 1998 ME 94, ¶ 8, 710 A.2d 897 (quotation marks omitted). We have alternatively articulated this

test as "the presence of a justiciable controversy." *Annable*, 507 A.2d at 595 (noting that other jurisdictions hold that "a justiciable controversy exists to support a declaratory judgment action when there is disagreement over an official interpretation of a statute"). More specifically, "[i]f a party asserts 'a disagreement over an official interpretation of a statute' that involves 'presently existing and specific facts, as opposed to hypothetical or uncertain facts,' that party has standing" to seek a declaratory judgment under the Act. *Passamaquoddy Water Dist.*, 1998 ME 94, ¶ 8, 710 A.2d 897 (quoting *Annable*, 507 A.2d at 595).

[¶14] The Parkers have established a justiciable controversy sufficient to seek a declaratory judgment. "In reviewing a trial court's decision on a motion to dismiss pursuant to M.R. Civ. P. 12(b)(6), we view the facts alleged in the complaint as if they were admitted." *Nadeau*, 2014 ME 154, ¶ 5, 108 A.3d 1254 (quotation marks omitted). The facts alleged in the complaint, taken as true, show presently existing and specific facts: the Parkers attempted to get permits to hunt on Sundays, and the Department refused to issue the permits due to their interpretation of the ban. The complaint alleges disagreement over the official interpretation of the ban. There is a claim of right fit for judicial review, namely the Parkers' right to hunt as necessary to obtain

food, which they allege to have been created by the amendment. The Parkers also have a sufficiently substantial interest that would result in hardship if review were withheld, as they claim that they are harmed by the denial of their right to hunt on Sunday. *See Nat'l Hearing Aid*, 376 A.2d at 459 (holding that "those persons who are . . . directly affected by a statute are considered to have a sufficient interest to create a justiciable issue when contesting that statute's validity" and concluding that an allegation that plaintiff would "suffer immediate and irreparable harm" upon the date the statute at issue came into effect was a sufficient pleading to establish that sufficient interest).

[¶15] Because the Parkers pleaded a sufficiently justiciable claim to warrant a declaratory judgment, we conclude that the trial court erred in dismissing the action for failure to state a claim upon which relief could be granted.[3]

---

[3] If a party presents a justiciable declaratory judgment complaint, this still does not guarantee that they will receive a declaratory judgment from the trial court, because the Act provides that a court "may refuse to render or enter a declaratory judgment or decree where such judgment or decree, if rendered or entered, would not terminate the uncertainty or controversy giving rise to the proceeding." 14 M.R.S. § 5958 (2023). We have held that a trial court should only issue a declaratory judgment "when some useful purpose will be served." *LeGrand v. York Cnty. Judge of Probate*, 2017 ME 167, ¶ 40, 168 A.3d 783 (quotation marks omitted); *Capodilupo v. Town of Bristol*, 1999 ME 96, ¶ 3, 730 A.2d 1257 ("The Superior Court has discretionary authority . . . to entertain requests for and to enter declaratory judgments in appropriate circumstances."). Still, a declaratory judgment would have served a useful purpose in this case because it would have clarified whether the ban had been rendered unconstitutional by the recently enacted amendment. Furthermore, unlike in *LeGrand*, where "the trial court engaged in a thoughtful exposition of the reasons not to issue a declaratory judgment," 2017 ME 167, ¶ 41, 168 A.3d 783, the trial court here simply entered a judgment of dismissal, finding that the Parkers failed to state a claim upon which relief could be

## B.    Constitutionality

[¶16]   Having determined that the trial court incorrectly dismissed the Parkers' declaratory judgment action, we would typically vacate and remand the case for further proceedings. "However, since the case comes before us with a complete record, we believe this is an appropriate time to entertain this claim for declaratory relief as an original matter.  By remanding to the Superior Court we could reasonably expect the issue of constitutionality to be immediately referred to us for decision." *Id*. (citation omitted); *see also Sebra v. Wentworth*, 2010 ME 21, ¶ 16, 990 A.2d 538 (holding that this Court may "consider [a] purely legal issue on appeal because its resolution does not require the introduction of additional facts, its proper resolution is clear, and a failure to consider it may result in a miscarriage of justice" (quotation marks omitted)); M.R. App. P. 1.  Accordingly, we proceed to consider the constitutionality of the ban in light of the amendment.

### 1.    The Ban Does Not Conflict with the Amendment

[¶17]   The Department argues that the Parkers failed to state a claim because the ban does not conflict with the amendment.

---

granted, rather than affirmatively exercising its discretion to decline to issue a declaratory judgment, which would require our review for abuse of discretion.  *Id.* ¶ 31.

12

[¶18]   We review questions of constitutional interpretation de novo, presuming statutes to be constitutional and resolving all reasonable doubts in favor of the constitutionality of the statute.[4]  *In re Weapons Restriction of J.*, 2022 ME 34, ¶ 12, 276 A.3d 510; *Opinion of the Justices*, 2017 ME 100, ¶ 58, 162 A.3d 188 ("A statute enjoys a heavy presumption of constitutionality." (quotation marks omitted)); *Bouchard v. Dep't of Pub. Safety*, 2015 ME 50, ¶ 8, 115 A.3d 92.  To determine whether the Maine Constitution and a Maine statute conflict, we look primarily to the plain language of both.  *State v. Reeves*, 2022 ME 10, ¶ 43, 268 A.3d 281; *Opinion of the Justices*, 2017 ME 100, ¶ 58, 162 A.3d 188 ("Our construction of the Maine Constitution depends primarily on its plain language, which is interpreted to mean whatever it would convey

_____

[4]  Notably, the amendment was enacted long after the ban had been in place.  *See* Me. Const. art. I, § 25; Const. Res. 2021, ch. 1, *approved in* 2021; P.L. 2003, ch. 414, § A-2 (effective Sep. 13, 2003); P.L. 2003, ch. 655, § B-137 (effective July 30, 2004).  We have noted the presumption of constitutionality on other occasions where we analyzed a statute enacted *after* the constitutional provision it allegedly conflicts with was established.  For example, in *Rideout v. Riendeau*, we analyzed whether a statute governing the rights of grandparents to visit their grandchildren over objections from parents conflicted with the due process clause of the Maine Constitution.  2000 ME 198, 761 A.2d 291.  In *Rideout* we held that "a statute is presumed to be constitutional, . . . [b]ecause we must assume that the Legislature acted in accord with due process requirements."  *Id.* ¶ 14 (citation and alterations omitted); *see also In re Guardianship of Chamberlain*, 2015 ME 76, ¶ 8, 118 A.3d 229.  However, we have also articulated other reasons that support a presumption of constitutionality, *see Opinion of the Justices*, 2017 ME 100, ¶ 59, 162 A.3d 188 ("There are several reasons why facial constitutional challenges are disfavored, including that they are decided on factually barebones records, risk an exposition of constitutional law broader than is required by the precise facts to which it is to be applied, and threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." (quotation marks omitted)); *see also Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008).  Accordingly, that the amendment was enacted after the ban does not necessarily overcome the presumption of constitutionality that we apply.

to an intelligent, careful voter." (quotation marks omitted)). Our analysis calls for us to answer two questions: (1) Does the amendment create a right to hunt wild animals; and (2) If so, does the ban infringe upon that right?

[¶19] We have noted that "constitutional provisions are accorded a liberal interpretation in order to carry out their broad purpose, because they are expected to last over time and are cumbersome to amend." *Payne v. Sec'y of State*, 2020 ME 110, ¶ 26, 237 A.3d 870 (quotation marks and alteration omitted). We have further held:

> We construe constitutional provisions by using the same principles of construction that we apply in cases of statutory interpretation. Thus, we will apply the plain language of the constitutional provision if the language is unambiguous, and if the provision is ambiguous, we will determine the meaning by examining the purpose and history surrounding the provision.

*Avangrid Networks, Inc. v. Sec'y of State*, 2020 ME 109, ¶ 14, 237 A.3d 882 (quotation marks, citations, and alterations omitted); *see also Jones v. Sec'y of State*, 2020 ME 113, ¶ 12, 238 A.3d 982.

### a. The Amendment Unambiguously Creates a Limited Right to Hunt

[¶20] Limiting our focus solely to the portions of the amendment that apply to the facts of this case, the amendment is unambiguous. It provides that "[a]ll individuals have . . . the right to . . . *harvest* . . . and consume the food of

their own choosing for their own nourishment, sustenance, bodily health and well-being." Me. Const. art. I, § 25 (emphasis added). Although the amendment itself does not define "harvest," Me. Const. art. I, § 25, for the following reasons, we conclude that the plain language of the amendment unambiguously enshrines a limited constitutional right to hunt:

(1) dictionaries define "harvest" as including hunting, *see State v. Marquis*, 2023 ME 16, ¶16, 290 A.3d 96 ("In determining the plain mean of statutory language in the absence of a statutory definition, we frequently look to dictionary definitions."); *Avangrid*, 2020 ME 109, ¶ 14, 237 A.3d 882 ("We construe constitutional provisions by using the same principles of construction that we apply in cases of statutory interpretation."); *Harvest*, Webster's New World College Dictionary (5th ed. 2016) (defining "harvest" as "to gather in (a crop, etc.) [or] to catch, shoot, trap, etc. (fish or game)"); *Harvest*, New Oxford American Dictionary (3d ed. 2010) (defining "harvest" as to "catch or kill (animals) for human consumption or use."); *but see Harvest*, Webster's II New College Dictionary (4th ed. 2001) (omitting any reference to the hunting, catching or killing of animals in the definition of "harvest");

(2) we have previously applied a definition of "harvest" that includes hunting, *Wuori v. Otis*, 2020 ME 27, ¶ 4 n.2, 226 A.3d 771;

(3) statutory sources, like the general definitions of Part 13 of Title 12, which covers the Department and contains the ban, further confirm that "harvest" is widely used in Maine statutes to refer to hunting. *See* 12 M.R.S. § 10001(31) (2023) ("**Hunt.** To 'hunt' means to . . . harvest wild animals . . . or attempt to . . . harvest wild animals."); *see also, e.g.,* 12 M.R.S. §§ 12301-A to 12351 (2023) (Chapter 919: Registration and Transport of Harvested Animals); and

(4) the Maine Legislature continues to propose legislation that would create further examples where "harvest" includes hunting. *See, e.g.,*

L.D. 1823 § 21 (131th Legis. 2023) ("**18-A. Harvest, the verb.** The verb 'harvest' means to gather, forage, catch, trap, hunt, fish, take or kill for human consumption, sport, wildlife management or population control.").

[¶21] Because the word "harvest" is already widely used and understood to include hunting in Maine, the plain language of the amendment unambiguously affirms a right to hunt for the limited purposes of "nourishment, sustenance, bodily health and well-being" by including the "right to . . . harvest" food.[5] Me. Const. art. I, § 25.

### b. The Ban Is Constitutional Because It Falls Within the Amendment's Poaching Exception

[¶22] Although the plain language of the amendment establishes a right to hunt, conflict with the ban may be avoided if the ban falls within one of the exceptions created by the amendment. The amendment includes a number of limitations on the broad right to food. Among them is the express provision that "individuals have a right to . . . harvest" only "as long as an individual does not commit . . . *poaching* . . . in the harvesting . . . of food." Me. Const. art. I, § 25 (emphasis added).

---

[5] We note that the language of the amendment does not extend the right beyond hunting for the specific purposes of "nourishment, sustenance, bodily health and well-being" to other purposes such as hunting for the purposes of sport or commercial enterprise. Me. Const. art. I, § 25.

16

[¶23] Maine statutes and caselaw are conspicuously bereft of uses of the word "poaching."[6] Like "harvesting," "poaching" is not defined in the amendment. Me. Const. art. I, § 25. Dictionaries define "poach" or "poaching" as "to take game or fish illegally . . . [or] to take (game or fish) by illegal methods," *Poach*, Merriam Webster's Collegiate Dictionary (11th ed. 2014); "to take (fish or game) illegally," *Poach*, Webster's II New College Dictionary (4th ed. 2001); and "the illegal taking or killing of fish or game on another's land," *Poaching*, Black's Law Dictionary (11th ed. 2019). *See Marquis*, 2023 ME 16, ¶16, 290 A.3d 96 ("In determining the plain meaning of statutory language in the absence of a statutory definition, we frequently look to dictionary definitions."); *Avangrid*, 2020 ME 109, ¶ 14, 237 A.3d 882 ("We construe constitutional provisions by using the same principles of construction that we apply in cases of statutory interpretation.").

---

[6] Only two Law Court cases have ever used the word, and the use of "poaching" in the amendment is the only use of the word in all of the Maine Revised Statutes and the Maine Constitution. *See* Me. Const. art. I, § 25; *State v. Lipham*, 2006 ME 137, ¶ 2, 910 A.2d 388 ("[T]he men intended to poach a deer."); *Barrows v. McDermott*, 73 Me. 441, 450 (1882) ("All plaintiff seems to have done . . . was to post his prohibitory notices to prevent . . . indiscriminate poaching upon what he proposed to make a private preserve."). Additionally, there have been but two references to "poacher" in Maine caselaw. *See State v. Googins*, 640 A.2d 1060, 1061 (Me. 1994) ("He testified that he heard two shots and, thinking they were fired by a poacher, called the local game warden when he arrived home."); *James v. Wood*, 82 Me. 173, 177 (1889) ("A poacher who has killed game, and thereby made it absolutely property, takes no title to it as against the owner of the soil, whose property it would have been, had he killed it." (citing *Blades v. Higgs*, (1865) 11 Eng. Rep. 1474 (H.L.))).

[¶24]   When the common definition of "poaching" is applied to the amendment, the effect of the poaching exception is that the right to hunt exists in situations in which hunting is otherwise legal but does not extend to situations in which hunting is illegal.  The amendment does not articulate what would render hunting illegal.  That said, neither party disputes the meaning of the ban, and we agree that the ban unambiguously provides that it is illegal to hunt on Sunday.  12 M.R.S. § 11205 ("A person may not . . . [h]unt . . . on Sunday . . . . A person who [hunts on Sunday] commits a Class E crime.").  Accordingly, the poaching exception in the amendment prevents the ban from conflicting with the amendment because hunting in violation of the ban is illegal, and the right to hunt created by the amendment does not extend to illegal hunting.  The poaching exception implicitly, but unquestionably, provides a grant of authority to the Legislature to define the parameters of the right to hunt that is created by the amendment.[7]

---

[7]   We have elsewhere found that the Maine Constitution makes grants of authority to the Legislature.  For example, in *School Committee v. Town of York*, where the Maine Constitution provided that "[t]he Legislature shall prescribe the procedure by which the municipality may [alter and amend their charters]" we determined that "[t]he Legislature has authority to grant municipalities broader home rule powers than are granted in the Constitution's home rule provision," because the Maine Constitution "contemplate[d] the enactment of procedural enabling legislation." Me. Const. art. VIII, pt. 2, § 1; *School Comm.*, 626 A.2d 935, 938-39 (Me. 1993).  We said there that "[a]lthough the Constitution's grant of home rule power is limited, it imposes no express or necessarily implied restrictions on the Legislature's powers to grant additional home rule authority to municipalities.  A state is free to delegate any powers it possesses to its political subdivisions." *Id.* at 939 (citations, alterations, and quotation marks omitted).  Notably, the portion of the Maine Constitution at issue in *School Committee* is different from the amendment, because,

18

[¶25] In sum, we hold that the right to hunt for food created by the amendment does not extend to illegal hunting, and therefore Maine's longstanding Sunday hunting ban does not conflict with the Maine Constitution.

The entry is:

> Judgment dismissing the complaint for declaratory judgment vacated. The case is remanded to the Superior Court for entry of judgment declaring the challenged statute to be constitutional.

Andrew Schmidt, Esq., and Pamela Lee, Esq. (orally), Borealis Law PLLC, Portland, for appellants Virginia Parker and Joel Parker

Aaron M. Frey, Attorney General, Paul E. Suitter, Asst. Atty. Gen. (orally), and Mark A. Randlett, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee Department of Inland Fisheries and Wildlife

Sigmund D. Schutz, Esq., and Jonathan Mermin, Esq., Preti Flaherty Beliveau & Pachios LLP, Portland, for amici curiae Maine Woodland Owners, Maine Farm Bureau, and Maine Forest Products Council

Kennebec County Superior Court docket number CV-2022-87
FOR CLERK REFERENCE ONLY

unlike the amendment, it does not provide for a "natural, inherent and unalienable right" and then implicitly allow the Legislature to make exceptions to it, rather, it explicitly authorizes the Legislature to establish procedures. *Compare* Me. Const. art. VIII, pt. 2, § 1, *with* Me. Const. art. I, § 25.