STATE OF MAINE
PENOBSCOT, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-09-007

ALEX HAMMER,

Petitioner,

v.

**DECISION & ORDER ON
80C APPEAL**

OFFICE OF THE MAINE
SECRETARY OF STATE

Respondent.

The matter before the Court is an appeal by the Petitioner, Alex Hammer, pursuant to 5 M.R.S. §§ 11001-11008 and Rule 80C of the Maine Rules of Civil Procedure, from a decision by the Respondent, Mathew Dunlap, Secretary of State, and the Bureau of Corporations, Elections and Commissions ("Bureau"), declaring seventy of Hammer's non-party nomination petitions for the November 2, 2010 General Election for the Office of Governor invalid on account of purported failures to meet the certification requirements of 21-A M.R.S. § 354. As a consequence of the Division's decision, invalidating seventy of the non-party nomination petitions, the petitioner failed to acquire the minimum number of signatures required—"at least 4,000 and not more than 6,000"— to ensure his placement on the November 2010 ballot as a independent candidate for the Office of Governor. 21-A M.R.S. § 354(5)(A). Having reviewed the administrative record and the parties' filings, the Court denies Petitioner Hammer's administrative appeal.

1

## BACKGROUND

On the record certified by the Secretary of State, the parties do not dispute the basic underlying facts giving rise to this administrative action. Pursuant to correspondence from Mr. Hammer, the Secretary of State, via the Bureau, delivered to him 100 of non-party petition forms. (Administrative Record at 24) [hereinafter R. at ___]. In an undated written reply, Hammer wrote back to Julie L. Flynn, Deputy Secretary of State, requesting both a copy of the 2010 Candidates Guide to Ballot Access and specific information regarding the contact information for the municipal town clerks and registrars located throughout the State. (R. at 23.) On January 8, 2010, Hammer delivered an email directly to Secretary of State Mathew Dunlap requesting that the Bureau send to him "additional ballot signature forms." (R. at 22.) Thereafter, Secretary Dunlap and Hammer engaged in an email exchange between January 8, 2010, and January 12, 2010. (R. at 22.) The substance of those emails demonstrates that Petitioner Hammer wanted additional copies of the non-party petitions while Secretary Dunlap consistently reiterated that Hammer could make photocopies of the petitions already provided, and that prospective candidates were responsible for duplicating the non-party petition form at their own expense. (R. at 22-23.)

After various communications with the Petitioner, (R. at 18), Deputy Secretary Flynn sent Hammer a letter explaining the petition process, and enclosed fifty additional non-party petitions along with the 2010 Candidate's Guide to Ballot Access. (R. at 19.) On February 18, 2010, Hammer indicated a preference for delivering some of his non-party petitions to municipal town clerks and registrars by submitting photocopies of them, (R. at 17), based on his realization that some of the petitions contained signatures

2

from more than one municipality. Hammer thus anticipated that he might be unable to circulate the "original" copy of some of the non-party petitions to each and every local municipality for certification:

> I was going to forward you copies of the multiple towns per ballot signature page (already covers hundred of signatures) and let you know that I plan to send the towns photocopies to certify (for your advisement) because it is logistically impossible to send same form to 15-20 or more towns (not enough time) and there is space on the back only for own [sic] town to certify number for each form as well.

(R. at 17.) Secretary Dunlap replied, "you can only photocopy the blank originals; for verification, the clerks need the original for the circulator's oath, etc." (*Id.*) Subsequently, Hammer and Secretary Dunlap engaged in another email exchange, with the Secretary once again advising Hammer that the certification process required delivery of each "original" petition to the local municipal officer charged with certifying signers, as registered voters, in each particular municipality noted on the form petition. (R. at 16.) On April 1, 2010, Hammer sent an email message to Secretary Dunlap requesting delivery of additional non-party petitions after recognizing that certification of some of his petitions might pose a significant logistical problem because they contained signers from "15-20 or more towns." (R. at 15.) Secretary Dunlap responded on April 2, 2010, informing Hammer that he would not authorize the delivery of additional petitions and reiterated that Hammer was free to make copies of a blank petition in the event he needed more forms. (R. at 14.)[1]

On May 10, 2010, Hammer initiated contact with Secretary Dunlap informing him that he intended to have "scanned" copies of some of the petitions made available to

---

[1] Throughout the nomination process, the Secretary also advised Hammer that he could avoid the logistical problems associated with municipal certification simply by organizing each non-party petition to include signers from one municipality. (*See* R. at 10, 16, and 18-19.)

3

the municipal town clerks and registrars through an internet file sharing program. (R. at 13.) During this exchange, Secretary Dunlap repeated that the various town registrars, consistent with 21-A M.R.S. § 354, could only certify signers if presented with the "original" copies of the non-party petitions. (*Id.*) Despite the Secretary Dunlap's warning that the town registrars were not permitted, by statute, to accept "copies" of the non-party petitions, and were therefore anemic to properly certify the signers, Hammer delivered a May 15, 2010, email to various town registrars requesting them to download electronically scanned copies of certain non-party petitions from an internet file sharing network in order to certify those voter signatures that appeared to be on the respective town voting rolls. (R. at 5, 12.) Included in the email, Hammer provided a "key" to each petition so that the various registrars and town clerks could locate those petitions that contained signatures of voters purportedly residing and registered to vote in each respective municipality. (*Id.*) In the email correspondence that followed, the Belfast City Clerk, Roberta Fogg, after consulting with Deputy Secretary Flynn, advised the town clerks and municipal officers copied on the email to refrain from certifying signatures using Hammer's proposed method of "delivery" until the Secretary of State's office had an opportunity to engage the Office of the Attorney General for guidance. (R. at 11.) On May 18, 2010, Deputy Secretary Flynn delivered a letter to Hammer indicating that the Secretary of State would not permit the various municipal authorities to accept for certification any petitions provided by Hammer in "scanned" or other facsimile format. (R. at 10.) Deputy Secretary Flynn also circulated a Memorandum to all municipal town clerks and registrars urging them not to accept Hammer's proposed method for certifying signatures and advised that they could only accept/certify those "original copies of

4

petitions containing signatures." (R. at 9.) On Monday, May 24, 2010, Hammer delivered an email message to the town clerks arguing that election laws permitted copies of the non-party petitions to be provided for certification. (R. at 7.)

On May 25, 2010, Hammer delivered the Secretary of State's office 175 properly certified petitions, 10 petitions with "copies" of certifications by municipal registrars, and 70 petitions without proper certifications by any of the municipal registrars. (*See* R. at 3-5.) On May 27, 2010, Director of Elections, Melissa Packard, delivered a letter to Hammer indicating that 3,209 signatures contained in 185 of the non-party petitions were properly certified and submitted, but that the Secretary could not accept as "valid" the signatures contained on 70 petitions because they did not contain the proper certification from local municipal officials. (R. at 1.) The Secretary therefore determined that Hammer had failed to obtain the 4000 certified petition signatures necessary to ensure a place on the November 2010 ballot for Governor. *See* 21-A M.R.S. § 354(5)(A).

After receiving Deputy Flynn's letter, Hammer appealed the Secretary's decision by filing a M.R. Civ. P. 80C complaint with the Penobscot County Superior Court on June 28, 2010. The State filed the administrative record on August 2, 2010. On September 10, 2010, some two days after Hammer had submitted his brief, the Court was finally alerted to existence of this administrative appeal.[2] Realizing the sensitivity of this litigation and its proximity to the upcoming November 2010 election, the Court held a conference call with the parties on September 15, 2010, in which the parties were advised that the litigation would be expedited. The Court ordered the State to file its brief by no

---

[2] The Penobscot County Superior Court Clerk issued a standard Scheduling Order that would have had the briefing in this case continue well into October.

later than September 22, 2010. The State filed its brief on that day, and the Petitioner filed his response on that date as well.

## STANDARD OF REVIEW

The Court's review of Petitioner's administrative appeal is confined by a deferential standard. Agency rulings may only be reversed or modified on M.R. Civ. P. 80C appeal upon a finding that the administrative ruling is: (1) in violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by bias or by error of law; (5) unsupported by substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion. 5 M.R.S. § 11007(4)(C)(1)–(6); *see also Seider v. Board of Examiners of Examiners of Psychologists*, 2000 ME 206, ¶ 8, 695 A.2d 552, 555 ("The standard of review [on M.R. Civ. P. 80C appeal] is limited to whether the [governmental agency] abused its discretion, committed an error of law, or made findings not supported by substantial evidence in the record.") (internal quotation mark omitted) (citation omitted). Long-established rules of statutory construction obligate this Court to construe Maine statutes through the lens of giving "effect to intent of the Legislature." *Knutson v. Sec'y of State*, 2008 ME 124, ¶9, 954 A.2d 1054, 1058 (quoting *Arsenault v Sec'y of State*, 2006 ME 111, ¶ 11, 905 A.2d 285, 287-88). The Court first endeavors "to effectuate the plain language of the statute." *Id.* Where, however, the language of the statute is ambiguous, the Court "will defer to the Secretary's interpretation if that interpretation is reasonable." *Id.*

6

*DISCUSSION*

The issue before the Court in this M.R. Civ. P. 80C action concerns whether the Secretary of State erred as a matter of law by instructing Hammer that he could submit only "original" copies of the non-party petition forms to town clerks and registrars, both preventing municipal authorities from certifying signatures contained in those petitions delivered by electronic means and culminating in the Bureau's rejection of 70 petitions. (*See* R. at 1, 5.) The statutory procedures outlined in 21-A M.R.S. §§ 351-57 provide the non-party candidate attempting to run for public office with a detailed framework for obtaining a position on the election ballot. *See id.* The requirements for that process are outlined in § 354(7).

The Secretary argues that the statute effectuating the petition certification process is unambiguous, and explicitly requires the candidate to deliver "original" copies of the non-party petitions to the various municipal officials responsible for certifying voter signatures. The Court agrees with the State's position.

The Legislature has decided that a "[a] nomination petition shall be on the form provided by the Secretary of State." 21-A M.R.S. § 354.[3] Once the Secretary distributes the petition form(s), the recipient candidate and/or his agents are left to circulate the petitions by gathering name and residence of registered voters, *id.* § 354(4), and the personal signature of each voter signing the petition "in such a manner as to satisfy the registrar of his municipality that he is a registered voter," *id.* § 354(3). After collecting

---

[3] There is no dispute that the Secretary delivered 150 non-party petitions to Hammer, enough to collect 6750 certified signatures, 750 more than Hammer would need, or the Secretary would ultimately accept, in declaring Hammer's nomination for the Office of Governor. *See* 21-A M.R.S. § 354(5)(C). As noted in the Court's recitation of the facts, Secretary Dunlap and Deputy Secretary Flynn repeatedly told Hammer that he could recreate the form petition provided by making photocopies of them in the event he ran out of forms. (R. at 16, 19, 22, and 23.)

7

the minimum number (but not exceeding the maximum number) of signatures needed for the particular office, all petitions are required to be "verified and certified" according to procedure contained in § 354(7)(A)-(C), the language critical to resolving the instant dispute.

Section 354(7)(A) requires the circulator to swear an oath "verifying that each of the signatures was made in his presence," *Knutson v. Secretary of State*, 2008 ME 124, ¶¶10-13, 954 A.2d 1054, 1058-59, and Section 354(7)(B)-(C) prescribes the certification method assumed by the individual town clerks and registrars:

> B. *Petitions must be delivered to the registrar*, or clerk at the request or upon the absence of the registrar, for certification by 5 p.m. on May 25th in the election year in which the petitions are to be used, except that petitions for a slate of candidates for the office of presidential elector must be delivered for certification by 5 p.m. on August 8th in the election year in which the petitions are to be used.
>
> C. The registrar, or clerk at the request or upon the absence of the registrar, of each municipality concerned shall certify which names *on a petition* appear in the central voter registration system as registered voters in that municipality and *may not certify any names that do not satisfy subsection 3*.

21-A M.R.S. § 354(7)(B)-(C) (emphasis added). Given the explicit procedural design of the non-party nomination process—from § 354(3)'s requirement that the voter "must personally sign the petition" on the "form provided by the Secretary of State" to § 354(7)(B)'s requirement that the "[p]etitions must be delivered to the registrar or clerk" and § 354(7)(C)'s restriction that a town clerk or registrar "may not certify any names that do not satisfy subsection 3"—the statute plainly indicates that the candidate seeking a non-party nomination deliver the "original" petition, complete with the "original" signatures of the voters signing the petition, to each town clerk or registrar responsible

8

for certifying signatures in their municipality.[4] Particularly relevant is Section 354(7)(C)'s requirement that a town clerk "may not certify names that do not satisfy subsection 3." This section presupposes that the voter's original signature appear on the petition delivered; otherwise, the town clerk may have no discernable method of distinguishing the circulator's writing from that of the signing voter.[5]

Even if the plain language of § 354(7)(B) were found to be ambiguous, the Court finds the Secretary's interpretation of the statute to be reasonable, and therefore, entitled to deference. *See, e.g., Knutson*, 2008 ME 124, ¶ 13, 954 A.2d at 1059 (deferring to the Secretary's interpretation of "presence" in the context of requiring circulator to directly observe a voter signature on a petition before the circulator can properly fulfill the obligation of his oath). Three considerations support this conclusion.

First, as the Secretary argues, "all methods of delivery are not equivalent." (Sec'y Br. at 10.) Petitioner Hammer suggests that the term "delivered" contained in § 354(7)(B) includes all possible methods of delivery, whether in hand, by mail, by facsimile, or by "scanned" electronic transmission. (*Id.*; *see* Petr.'s Br. at 2; R. at 7.). Petitioner Hammer realized relatively early in the petition process—at least by February 18, 2010—that he might not be able to deliver the "original" copy of some of the petitions, especially those containing voter signatures from "15-20 or more towns," (R. at 13, 17; *see also* R. at 5.) to each municipality charged with certifying signatures by May

---

[4] Petitioner Hammer also suggests that the 70 petitions containing the signatures from voters registered in disparate geographic locations, (R. at 5), could be delivered and certified by one municipal town clerk or registrar given each municipality's "capacity to certify names from throughout the state." (R. at 13.) This proposed certification method clearly contradicts plain language of 21-A MRS § 354(7)(C) and does not constitute a ground upon which Hammer might be entitled to relief in the M.R. Civ. P. 80C action now before the Court. *See id.* ("The registrar, or clerk at the request or upon the absence of the registrar, *of each municipality concerned* shall certify which names on a petition appear in the central voter registration system as registered voters *in that municipality* . . . .") (emphasis added).

[5] Subsections 354(3)-(4) permit the circulator to "print the voters name" and/or "write or print the voter's residence address and the municipality of registration." *Id.*

9

25, 2010. To that end, on May 15, 2010, Hammer delivered an email correspondence to various town clerks outlining an alternative system of "delivery" by which the municipal clerks could " download and extract PDF" versions of the petitions from Hammer's website; view them using Adobe Reader; verify those voters' signatures appearing on each petition purported to be registered in each respective municipality; complete the scanned version of the registrar's certification for each petition reviewed; and email the scanned version of the certification back to the Petitioner. (R. at 12.) However, in the Court's view, Section 354(7)(B) contemplates a transfer of physical documents, and not electronic delivery of over 70 non-party petitions nine days before the petitions were, by statute, required to be in the hands of town clerks and registrars. *See Blacks Law Dictionary* 494 (9th ed. 2009).[6]

Second, when the petition certification process is compared to other statutory provisions allowing "copies" of official forms to be used, accepted, delivered, or distributed in the election process, the Legislature has made those exceptions clear in the election statute. *See, e.g.*, 21-A M.R.S. § 737-A(7) (requiring the Secretary to make photocopies of the disputed ballots in the event of an election recount); *id.* § 852(5) (mandating the warden at each polling place, at the close of Election day, "to run an additional copy of the tally tape to provide to the clerk with the tally sheets and the return of the votes cast"); *id.* § 711(1)-(2) (requiring the municipal clerk to prepare election returns by making "an attested copy" of the returns "and immediately send them to the Secretary of State"); *id.* § 753-A(3) (permitting a voter applying for an absentee ballot to

---

[6] Not only would electronic delivery contravene the plain language of § 354(7)(B), requiring that "original" petition be delivered to the town clerk, it would also inevitably cause town clerks and registrars to laboriously plow through each "scanned" petition, or "key" provided for each petition, to locate those voters purportedly residing and registered to vote in that particular municipality. This seems to be precisely the type of result § 354 is designed, at least in part, to prevent.

10

make a written request "by mail, in person, or by facsimile"). Even where the statute permits electronic delivery of election-related documents, those situations are limited and precisely defined. *See* 21-A M.R.S. § 753-(A)(6) (allowing municipal clerks the option of accepting absentee ballots by e-mail provided the clerk follows certain procedures specified in the provision); *id.* § 783(5), enacted by P.L. 2009, c. 563, § 9 (eff. March 29, 2010) (authorizing "electronic receipt of an image of voted absentee ballots transmitted by email or fax from uniformed service voters or overseas voters"). The existence of these statutory provisions demonstrates that if the Legislature intended or contemplated that non-party petitions could be delivered to municipal town clerks and registrars in electronic, facsimile or other "copy" format, it would have clearly provided for these alternatives in § 354(7)(B). The Court cannot therefore say that the Legislature intended to permit delivery of non-party petitions in the manner proposed by the Petitioner in this case.[7]

Finally, if there was any doubt as to whether the § 354(7)(B) requires delivery of the "original petition," the intent of the Legislature is readily ascertained by the provision in the Maine Constitution from which § 354(7) is ultimately derived:

> "written petition" means one or more petitions written or printed, or partly written and partly printed, *with the original signatures of the petitioners attached*, verified as to the authenticity of the signatures by the oath of the circulator that all of the signatures to the petition were

---

[7] The Court finds the Secretary's interpretation reasonable for the additional reason that allowing potential candidates to deliver "copies" of the petitions could increase the potential for forged signature and otherwise "mask material alterations to a petition." (Sec'y Br. at 15; R. at 13.) Further, electronic transmittal of the documents under the circumstances proposed by Hammer—on an unsecure, private website—poses a substantial risk of compromising the security municipal computer systems. (Sec'y Br. at 16). The explicit statutory framework of Maine's election statute lends credence to the Secretary's view that "if the statute could be read to allow registrars to certify petitions based on a review of an electronic image of the petition, the Secretary . . .would establish a secure, public website for that purpose." (*Id.*) In concluding this, Court does not mean to impugn Mr. Hammer's credibility or otherwise suggest that he was motivated to deliver fraudulently obtained signatures.

11

made in the presence of the circulator and that to the best of the circulator's knowledge and belief each signature is the signature of the person whose name it purports to be, and accompanied by the certificate of the official authorized by law to maintain the voting list or to certify signatures on petitions for voters on the voting list of the city, town or plantation in which the petitioners reside that their names appear on the voting list of the city, town or plantation of the official as qualified to vote for Governor.

*Arsenault v. Sec'y of State*, 2006 ME 111, ¶ 11 n.5, 905 A.2d 1054, 1058 n.5 (quoting ME. CONST. art. IV, pt 3, § 20). The Law Court previously held that Maine's election laws are written in "painstaking detail" and the Secretary of State, despite its obligation to provide oversight of election processes, cannot usurp the proper function of the Legislature to set election "policy" by enacting election laws consistent with the Maine Constitution. *See Knutson,* 2008 ME 124, ¶27, 954 A.2d at 1062 ("Although the Secretary's policy decision, attempting to save petitions in certain circumstances, may not be unreasonable, it is the Legislature that weighs the competing considerations and sets the policy.") (emphasis in original); *Arsenault,* 2006 ME 111, ¶ 23, 905 A.2d at 289-90 (noting that the Secretary is without the power to "fashion a limitation that does not exist in the statutes"). On the facts of this case, the Secretary of State has not engaged in the type of policy-making that would appear to controvert ME. CONST. art. IV, pt. 3, § 2 or the statute modeled after it, 21-A M.R.S. § 354(7)(B).

Given the forgoing analysis, the Court need not reach the Secretary's additional argument that granting Hammer's requested relief at this point would "disrupt the election process and potentially disenfranchise Maine voters." (Sec'y Br. at 16.) The Court here finds that the Secretary correctly interpreted the language of 21-A M.R.S. §

12

354 according to its plain language; and alternatively, determines that the Secretary's interpretation of the petition certification provision to be reasonable.

Because the Petitioner could submit enough certifications to tally only 3209 registered voters, he fell short of accomplishing the 4000 properly certified signatures necessary to ensure his place on the November 2010 ballot for the Office of Governor.

The entry is:

1. Petitioner's M.R. Civ. P. 80C appeal is **DENIED.**

2. At the direction of the Court, this Order shall be incorporated into the docket by reference. M.R. Civ. P. 79(a).

Date: September __, 2010

M. Michaela Murphy
Justice, Superior Court