STATE OF MAINE                                    SUPERIOR COURT
KENNEBEC, ss.                                     CIVIL ACTION
                                                  DOCKET NO. AP-23-42

                                        )
CHRISTOPHER CHRISTIE,                   )
                                        )
            Petitioner,                 )
                                        )
                                        )
    v.                                  )         **DECISION AND ORDER**
                                        )
SHENNA BELLOWS, in her official         )
capacity as Secretary of State for the  )
State of Maine,                         )
                                        )
            Respondent.                 )
                                        )

On December 1, 2023, Petitioner and Republican presidential candidate

Christopher Christie ("Petitioner" or "Mr. Christie") filed a petition with the

Secretary of State ("the Secretary") to appear on the ballot for the upcoming

primary election. The Secretary rejected his petition because Mr. Christie failed to

meet the signature threshold established by Maine law, which required him to

submit a minimum of 2,000 certified signatures from registered Republican voters.

Mr. Christie appeals the Secretary's decision pursuant to M.R. Civ. P. 80C and 21-A

M.R.S. § 337(2)(D). For the reasons that follow, the court affirms the Secretary's

decision.

## BACKGROUND

*Legal Framework.* Petitioner seeks to be listed on the ballot as a candidate

for the 2024 Republican presidential primary.[1] To qualify for inclusion on Maine's

---

[1] The primary election is scheduled for March 5, 2024. 21-A M.R.S. § 441(1).

primary ballot, candidates must obtain a minimum of 2,000 signatures from registered voters enrolled in that candidate's party. 21-A M.R.S. §§ 335(2)-(3) & (5)(B-3). Additionally—and critical to the issues here—a municipal registrar must certify that the person signing the petition is enrolled in the proper party and is a registered voter in "that municipality." *Id.* § 335(7)(B).

Under Maine law, registrars are municipal officials, appointed for two-year terms by the municipal officers. *Id.* § 101(2). Registrars have statutory responsibilities relating to voter registration within the municipality, including the "exclusive power" to determine an applicant's eligibility to register, *id.* § 121; the obligation to keep registration information about municipal voters current in the state's central voter registration system, *id.* § 161(2-A); and the duty to keep certain information on file, including the "original, signed voter registration application for each voter," *id.* § 172.

Section 335(7)(B) of Title 21-A sets forth the municipal certification process for petition signatures as follows:

> The registrar, or clerk at the request or upon the absence of the registrar, of each municipality concerned shall certify which names on a petition appear in the central voter registration system as registered and enrolled voters in that municipality and may not certify any names that do not satisfy subsection 3.

*Id.* § 335(7)(B). Subsection 3 requires that the voter "personally sign that voter's name in such a manner as to satisfy the registrar of that voter's municipality that the voter is a registered voter and enrolled in the party named on the petition." *Id.* § 335(3).

2

Consistent with these statutory provisions, the Secretary issued guidance relevant to the municipal certification process. Specifically, in the agency's "Guide to Ballot Access for the March 5, 2024 Presidential Primary," the Secretary stated: "A separate petition form should be used for each municipality in which signatures are submitted. (This is for ease of municipal verification of voters; a petition form signed by voters from multiple municipalities will not be invalidated on that basis)." R. 7.

Moreover, primary petitions are subject to various statutory deadlines. Petitions for presidential primaries "must be delivered to the registrar, or clerk at the request or upon the absence of the registrar, for certification by 5 p.m. on November 20th of the year prior to a presidential election year." 21-A M.R.S. § 442. Petitions thereafter must be "completed and filed with the Secretary of State no later than 5 p.m. on December 1st of the year prior to a presidential election year." *Id.*

After a petition is filed with the Secretary of State, the Secretary must "review it and, if the petition contains the required number of certified names and is properly completed, shall accept and file it." *Id.* § 337(1).

***Mr. Christie's Petition***. In the fall of 2023, circulators began collecting signatures for Mr. Christie's primary petition on individual petition forms[2] prepared

---

[2] Petition forms are two-page documents that circulators use to collect signatures. *E.g.*, R. 13-14. When the various two-page forms are combined, they constitute the "primary petition" or "petition" under Maine law. *See* 21-A M.R.S. § 335(1) ("A primary petition may contain as many separate papers as necessary . . . ."). This order refers to the two-page signature-collection forms as the

3

by the Secretary. Mr. Christie's campaign then submitted the petition forms to various municipal registrars—including registrars in Augusta, Bangor, Lewiston, and Auburn—for certification of the signatures. *E.g.*, R. 15-274.

Many of the petition forms submitted for municipal certification were signed by voters from multiple municipalities. *E.g.*, R. 33-34, 63-66, 91-92, 109-10, 151-52, 159-60, 163-68, 273-74. When a municipal registrar was presented with one of these forms, the registrar checked and certified only those signatures that belonged to voters registered in that municipality. For instance, when Augusta's registrar received a petition form signed both by voters registered in Augusta and Hallowell, the registrar certified the Augusta signatures only. *E.g.*, R. 33-34.

On December 1, 2023, Petitioner submitted his primary petition to the Secretary for her approval. R. 1. Although the petition contained 3,142 signatures, (R. 13-1504), many of the signatures had not been reviewed for certification because Mr. Christie's campaign had not delivered them to the registrar of the voter's municipality. *E.g.*, R. 33-34, 63-66, 91-92. That same day, the Secretary issued a written decision finding that the primary petition did not meet the statutory signature threshold and therefore rejecting the petition pursuant to 21-A M.R.S. § 337(1). The Secretary explained:

> The petition you submitted today contained a total of 844 names certified by municipal registrars. Even assuming the petition contained no other defects, this number is short of the 2,000 signatures

---

"petition forms" and the forms collectively as the "primary petition" or the "petition."

4

required for the Secretary of State to accept the petition under 21-A M.R.S. §§ 335(5)(B-3) and 337(1). On behalf of the Secretary of State, I am rejecting the petition on this basis.

R. 1.

*Procedural History.* On December 6, 2023, Petitioner filed a petition for judicial review pursuant to M.R. Civ. P. 80C and 21-A M.R.S. § 337(2)(D). He raises the following issues:

1. The Secretary's "decision was made upon unlawful procedure in the city of Augusta"; specifically, the Augusta City Clerk's Office operated under a mistaken belief as to the certification deadline and engaged in a "rushed, short-staffed" process that likely undercounted the number of valid signatures;

2. The Secretary erred in rejecting the primary petition because each municipal registrar misapplied the applicable statutes by certifying only those signatures that belonged to residents of the registrar's respective municipality;

3. The Secretary's interpretation of the statutory provisions governing the municipal certification process violates Petitioner's state and federal due process rights; and

4. The Secretary's rejection of the petition was "arbitrary or capricious in light of [Petitioner's] substantial compliance" with the applicable statutes.

In support of these contentions, Petitioner attaches several affidavits to his petition. These affidavits do not appear in the administrative record.

Petitioner asks the court to vacate the Secretary's decision and order the Secretary to (1) deliver all petition forms to the municipal registrars; (2) issue guidance to the registrars instructing them to review all signatures, including those rejected as out-of-municipality; and (3) count the signatures in accordance with statutory requirements. Alternatively, Mr. Christie asks the court to vacate and

5

remand with instructions that Augusta's municipal election officials perform "a recertification process of all signatures received by November 20, 2023, by 5 p.m."

By stipulated motion of the parties, the court issued an expedited briefing schedule and heard oral argument on December 20, 2023. By statute, the court is required to decide this appeal "within 20 days of the date of the decision of the Secretary of State," and issues this decision in accordance with that timeline. 21-A M.R.S. § 337(2)(D).

## STANDARD OF REVIEW

Pursuant to 21-A M.R.S. § 337, an action seeking review of the Secretary's decision on a primary petition "must be conducted in accordance with the Maine Rules of Civil Procedure, Rule 80C, except as modified by this section." 21-A M.R.S. § 337(2)(D); *see also Palesky v. Sec'y of State*, 1998 ME 103, ¶¶ 5-6, 8, 711 A.2d 129 (interpreting analogous provision governing judicial review of decisions on direct initiative petitions and concluding that Rule 80C provides the procedural framework; "full de novo trial" is not permitted).[3] Under Rule 80C, the court is not permitted to overturn an agency's decision "unless it: violates the Constitution or statutes; exceeds the agency's authority; is procedurally unlawful; is arbitrary or

---

[3] *Compare* 21-A M.R.S. § 337(2)(D) ("This action must be conducted in accordance with the Maine Rules of Civil Procedure, Rule 80C, except as modified by this section. . . . The court shall issue a written decision containing its findings of fact and conclusions of law and setting forth the reasons for its decision within 20 days of the date of the decision of the Secretary of State"), *with* 21-A M.R.S. § 905(2) ("This action must be conducted in accordance with the Maine Rules of Civil Procedure, Rule 80C, except as modified by this section. . . . The court shall issue its written decision containing its findings of fact and stating the reasons for its decision before the 40th day after the decision of the Secretary of State.").

capricious; constitutes an abuse of discretion; is affected by bias or error of law; or is unsupported by the evidence in the record." *Kroger v. Dep't of Env't Prot.*, 2005 ME 50, ¶ 7, 870 A.2d 566; 5 M.R.S. § 11007(4). The party seeking to vacate a state agency decision has the burden of persuasion on appeal. *Anderson v. Me. Pub. Emp. Ret. Sys.*, 2009 ME 134, ¶ 3, 985 A.2d 501.

When reviewing agency decisions, the court must examine "'the entire record to determine whether, on the basis of all the testimony and exhibits before it, the agency could fairly and reasonably find the facts as it did.'" *Friends of Lincoln Lake v. Bd. of Env't Prot.*, 2010 ME 18, ¶ 13, 989 A. 2d 1128 (quoting *Int'l Paper Co. v. Bd. of Env't Prot.*, 1999 ME 135, ¶ 29, 737 A.2d 1047). The court may not substitute its judgment for that of the agency on questions of fact. 5 M.R.S. § 11007(3).

In matters of statutory interpretation, the court "interpret[s] every statute de novo as a matter of law to give effect to the intent of the Legislature, first by examining its plain language." *Reed v. Sec'y of State*, 2020 ME 57, ¶ 14, 232 A.3d 202 (quotation marks omitted). If the plain language is unambiguous, the court interprets the statute according to its unambiguous meaning. *Id.* "If, however, a statute is ambiguous—i.e., it is reasonably susceptible to different interpretations— [the court] defer[s] to the agency's reasonable construction when the agency is tasked with administering the statute and it falls within the agency's expertise." *Id.* (quotation marks omitted). The court accordingly must defer to the Secretary's "reasonable interpretation of [an] ambiguous statute[]." *Id.* ¶ 18; *see also*

7

*Melanson v. Sec'y of State*, 2004 ME 127, ¶ 15, 861 A.2d 641 (deferring to the Secretary's reasoning in interpreting an election statute).

## DISCUSSION

### I. Alleged Errors in Augusta's Municipal Certification Process

Petitioner first contends that the Augusta City Clerk's Office engaged in a "rushed, short-staffed" process and operated under a mistaken belief that the certification deadline was later than it was. Pet. ¶¶ 43-47. Both alleged issues, Petitioner asserts, resulted in a likely under-count of the number of valid signatures. *See id.*[4]

To support this argument, Petitioner directs the court to the affidavit of Michael Buttersworth, wherein Mr. Buttersworth explains that his company was able to independently validate 646 signatures belonging to registered voters in Augusta—a number greater than the 312 signatures validated by the August City Clerk's Office. Buttersworth Aff. ¶ 5. Mr. Buttersworth compares these numbers to those in Bangor, observing that his company internally verified 260 signatures belonging to registered Bangor voters, whereas Bangor's City Clerk verified 307

---

[4] The Secretary argues that the court should summarily reject this argument because she could not have committed reversible error in failing to accept a petition containing only 844 certified signatures; in the Secretary's view, any flaw in the certification process rested with the City of Augusta, which is not a party to this Rule 80C action. Resp't's Br. 11. Petitioner contends that Rule 80C nonetheless permits the court to fashion a remedy that would include remanding to the Secretary with instructions to direct Augusta to redo the certifications. The court need not definitively resolve this conflict over the scope of its authority because Petitioner has failed to demonstrate a material flaw in Augusta's process warranting remand. *See infra.* pp. 8-10.

signatures. Buttersworth Aff. ¶ 6. Petitioner therefore argues that "it stands to reason that Augusta's numbers should have been higher, not lower, than 646 signatures." Pet. ¶ 45.

The court rejects this as a basis to remand for two reasons. First, the administrative record shows that the Augusta registrar complied with her statutory duties by reviewing and making certification decisions for signatures from purported Augusta voters. *See, e.g.*, R. 15-82; 462-78; 998-1106; 1269-1340. Petitioner does not identify any specific errors in these certification decisions. In the absence of such evidence, Petitioner's proffered statistical analysis is too speculative a basis on which to overturn the Secretary's decision.[5] Petitioner therefore fails to demonstrate that "no competent evidence" supports the result reached by the agency. *See Seider v. Bd. of Examiners of Psychologists*, 2000 ME 206, ¶ 9, 762 A.2d 551 ("The burden of proof rests with the party seeking to overturn the agency's decision" and "[t]hat party must prove that no competent evidence supports the [agency's] decision.").

Second, the Secretary correctly points out that even assuming *all* Augusta signatures submitted by the campaign—a total of 1,299 names—were valid, Petitioner would still fall short of the 2,000-signature threshold; thus, the alleged flaws in the Augusta process are not a sufficient basis on which to reverse the Secretary's decision or to otherwise justify a remand to the agency. *Cf. Reed*, 2020

---

[5] For purposes of this decision, the court has assumed without deciding that it can consider evidence offered by Petitioner that was not in the administrative record. *See* M.R. Civ. P. 80C(e).

9

ME 57, ¶ 8, 232 A.3d 202 (Superior Court remanding matter to the Secretary for the taking of additional evidence where evidence was "'material to the issues presented in the review' because the number of signatures . . . challenged could affect the validity of the petition as a whole").

## II. Statutory Arguments

Petitioner contends that the Secretary erred as a matter of law by rejecting his petition in reliance on the certification decisions of municipal registrars who did not fulfill their statutory duties. Pet. ¶¶ 49-59. Under Petitioner's reading of the pertinent statutes, the registrars should have certified out-of-municipality signatures or taken responsibility for circulating the petition forms to other municipalities for certification. The Secretary argues that there was no error because Maine law unambiguously places the burden on a candidate and his circulators to submit petition forms to the municipalities of each voter signing the petition. The court agrees with the Secretary's position.

At issue are the statutes governing the signature certification process. Section 335(7)(B) of Title 21-A provides that the registrar or clerk "of each municipality concerned" shall certify whether the voters named in the petition are "registered and enrolled . . . *in that municipality*[.]" 21-A M.R.S. § 335(7)(B) (emphasis added). The statute then goes on to prohibit certain conduct by a registrar, stating: "[the registrar] *may not* certify any names that do not satisfy [§ 335(3)]." *Id.* (emphasis added); *see also* 21-A M.R.S. § 7 ("When used in this Title, the term 'may not' indicates a lack of authority or permission to act or refrain from

10

acting in the manner specified by the context."). Section 335(3), in turn, provides that the voter's signature must "satisfy the registrar of *that voter's municipality*[.]" *Id.* § 335(3) (emphasis added). These provisions unambiguously permit a municipal registrar to certify only the signatures of voters residing in that municipality.

In support of his claim that the Secretary erred, Petitioner posits instead that § 335(3)'s requirement that a signature should "satisfy the registrar of that voter's municipality" articulates a qualitative standard that governs signature review but does not dictate who should perform that review. He points to a directive elsewhere in the statute that registrars use the central voter registration system in their certification decisions as evidence that certifications need not be made on a municipal basis. *See* 21-A M.R.S. § 335(7)(B).

The court finds this interpretation of § 335 implausible. If the Legislature intended to permit *any* registrar to use the central voter registration system to certify *any* voter's signature, then the requirement that the signature must "satisfy the registrar *of that voter's municipality*" would be unnecessary. The court will not interpret the statute in such a way as to render some words meaningless. *See Att'y Gen. v. Sanford*, 2020 ME 19, ¶ 19, 225 A.3d 1026 (noting "the canon of statutory interpretation that '[w]ords in a statute . . . be given meaning and not treated as meaningless and superfluous'" (quoting *Wong v. Hawk*, 2012 ME 125, ¶ 8, 55 A.3d 425)).

The court's reading of § 335 also comports with the decision in *Hammer v. Secretary of State*. There, the Law Court adopted a Superior Court decision finding

11

that a nearly identical statute governing certification of nonparty gubernatorial petitions does not permit one municipal registrar to certify all the names on a multi-town petition form. *See Hammer v. Sec'y of State*, 2010 ME 109, ¶ 4, 8 A.3d 700, at App. n. 4; *Hammer v. Sec'y of State*, No. AP-09-007, 2010 WL 8495539 (Me. Super. Ct. Sept. 28, 2010) (finding that petitioner's "proposed certification method clearly contradicts the plain language of" 21-A M.R.S. § 354(7)(C), which provides that the "registrar . . . of each municipality concerned" shall certify the signatures of voters registered "in that municipality").

Perhaps recognizing the lack of ambiguity in § 335, Petitioner advances the alternative argument that the Secretary misinterpreted the requirements for delivering petition forms to municipalities. *See* Pet. ¶¶ 53-58. Here he relies on § 442 of Title 21-A, which requires presidential primary petition forms to be delivered "to *the registrar* . . . for certification by 5 p.m. on November 20th of the year prior to a presidential election year." 21-A M.R.S. § 442 (emphasis added). Petitioner asserts that the reference to "the registrar" is nonspecific, meaning that once a candidate delivers signatures for review to *any* municipal registrar, it becomes that person's duty to circulate petition forms as needed to other municipalities. Pet. ¶¶ 55-56.

This argument, too, is contrary to the plain language of the statute, which refers to "*the* registrar" as opposed to "a" or "any" registrar. The use of the definite article indicates that a petition form must be delivered to the specific registrar tasked with the certification decision, i.e., of the municipality at issue. As the

Secretary notes, the law explicitly provides for a petition to "contain as many separate papers as necessary," presumably to enable circulators to use separate petition forms for each municipality. 21-A M.R.S. § 335(1).

This interpretation of the statute is also consistent with the *Hammer* decision. There, Mr. Hammer, a candidate for governor, collected petition forms that in some cases contained signatures of voters from as many as 15 or 20 towns. *Hammer*, 2010 ME 109, 8 A.3d 700, at App. To ease the logistical burden of delivering the same form to multiple municipalities, Hammer e-mailed electronically scanned copies of the petitions to various town registrars. *Id.* Upon receiving guidance from the Secretary of State that the statute required delivery of original, hard copy petitions, the registrars did not certify the scanned petitions, leaving Hammer short of the number of signatures required to appear on the gubernatorial ballot. *Id.*

On appeal, Hammer argued that the Secretary erred as a matter of law by instructing the registrars that the statute demanded original petition forms for certification purposes. *Id.* The statute at issue in the *Hammer* case, like § 442, required "[p]etitions . . . to be delivered to the registrar . . . for certification" by a specific date and time. *See id.* (quoting 21-A M.R.S. § 354(7)(B)). The Superior Court—whose reasoning, as previously noted, was later adopted by the Law Court—concluded that the Secretary correctly interpreted the statute, explaining: "the statute plainly indicates that the candidate seeking a non-party nomination deliver the 'original' petition, complete with the 'original' signatures of the voters signing

the petition, *to each town clerk or registrar* responsible for certifying signatures in their municipality." *Id.* (emphasis added).

Although the precise issue in *Hammer* was whether a candidate could deliver a scanned as opposed to original petition form for certification, underpinning the court's analysis was the understanding that the statute required *the candidate* to deliver petition forms to the proper town registrars. *Id.* Indeed, the dispute would not have arisen if Hammer simply could have delivered all multi-town petition forms to one registrar, an option the court did not consider as compatible with the law. *See Hammer*, 2010 ME 109, ¶ 4, 8 A.3d 700, at App.; *Hammer*, No. AP-09-007, 2010 WL 8495539 (Me. Super. Ct. Sept. 28, 2010).

As the Secretary notes, the Legislature had the benefit of the decision in *Hammer* when it enacted § 442 in 2019, *see* P.L. 2019, ch. 445, § 4 (effective Sept. 19, 2019), thus precluding an argument that the identical language in § 442 has a different meaning. *See Doherty v. Merck & Co.*, 2017 ME 19, ¶ 19, 154 A.3d 1202 ("The Legislature is presumed to be aware of the state of the law and decisions of this Court when it passes an act" (quoting *Musk v. Nelson*, 647 A.2d 1198, 1202 (Me. 1994)). Although Petitioner contends the Legislature may have intended to establish different rules for presidential candidates, the language of § 442, which explicitly incorporates statutory provisions applicable to all types of candidates, suggests the opposite. *See* 21-A M.R.S. § 442 (indicating that primary petitions must be completed in the manner provided by §§ 335 and 336, which govern primaries for a variety of county, state, and federal positions).

14

Further, to the extent there is any ambiguity in the statutory scheme regarding how signatures are to be certified, the court finds the Secretary's interpretation of the statutes to be reasonable, and therefore, entitled to deference. *See Reed*, 2020 ME 57, ¶¶ 14, 18, 232 A.3d 202; *Knutson v. Sec'y of State*, 2008 ME 124, ¶¶ 13, 18, 954 A.2d 1054; *Melanson*, 2004 ME 127, ¶¶ 8, 13, 15, 861 A.2d 641. The Secretary persuasively argues that Petitioner's interpretations are practically unworkable. *See* Resp't's Br. 15. For example, under Petitioner's view that § 335 requires registrars to certify out-of-municipality signatures, a candidate could in theory deliver 5,000 signatures from voters residing throughout the State to one small-town registrar on November 20 and expect that person to certify and review all of them by the December 1 deadline.

Reading § 442 to require registrars to circulate original petitions between towns is also impractical. As the Secretary notes, a single petition form can include up to 40 names. *See, e.g.*, R. 13-14. Each of those names could belong to a voter from a different town. The decision in *Hammer* teaches that under an analogous statutory scheme, a municipal registrar must certify the original petition, not a copy. *Hammer*, 2010 ME 109, 8 A.3d 700, at App.; *Hammer*, No. AP-09-007, 2010 WL 8495539 (Me. Super. Ct. Sept. 28, 2010) (concluding that Maine law requires "that the candidate seeking a non-party nomination deliver the 'original' petition, complete with the 'original' signatures of the voters signing the petition, to each town clerk or registrar responsible for certifying signatures in their municipality"). Under Petitioner's interpretation of the statute, then, upon receiving such a form at

5 p.m. on November 20th, a registrar must first review for certification any signatures from that town, and then physically deliver the original petition to each of the other towns listed for certification, all in advance of the December 1st deadline to provide the certified petitions to the Secretary. The Secretary reasonably concluded that this cannot have been what the Legislature intended.

Finally, Petitioner asserts that if the Secretary's interpretation of the statutes is correct, then the Secretary's written guidance was erroneous and should result in a remand. Pet. ¶ 51. However, consistent with the law, the guidance instructs: "A separate petition form should be used for each municipality in which signatures are submitted." R. 7. Petitioner cannot now assert error on the part of the Secretary when he failed to follow her guidance. *See Shackford & Gooch, Inc. v. Town of Kennebunk*, 486 A.2d 102, 105-06 (Me. 1984). While it is true, as Petitioner notes, that the guidance does not explicitly warn candidates that failure to separate petition forms by municipality could result in incomplete certifications, a plain reading of the statutes makes this consequence clear. *See* 21-A M.R.S. §§ 335(3), (7)(B). Petitioner, moreover, has not raised an equitable estoppel argument.

In sum, Petitioner has not demonstrated that the Secretary's certification decision was legally erroneous.

### III. Constitutional Arguments

Because the court concludes that the statute does not permit a municipal registrar to certify the signatures of voters from other municipalities, the court

16

must next consider whether this statutory requirement, as applied in this case, violates Petitioner's state and federal due process rights.

"A person challenging the constitutionality of a legislative enactment 'bears a heavy burden of proving unconstitutionality[,] since all acts of the Legislature are presumed constitutional.'" *Jones v. Sec'y of State*, 2020 ME 113, ¶ 18, 238 A.3d 982 (quoting *Goggin v. State Tax Assessor*, 2018 ME 111, ¶ 20, 191 A.3d 341) (alteration in original). To overcome this presumption, the challenger must "demonstrate convincingly that the law and the Constitution conflict.'" *Id.* (quotation marks omitted). "All reasonable doubts must be resolved in favor of the constitutionality of the enactment." *Id.* (quotation marks and alterations omitted).

*A. Procedural Due Process*

Petitioner asserts that the statutory procedures "carry an extremely high risk of erroneous deprivation, because they allow for a candidate who can show substantial support, such as over five-thousand voter signatures, to face deprivation of ballot access on the basis of a minor administrative procedural requirement[.]" Pet. ¶ 65. The court disagrees. The statutes as interpreted by the Secretary pose little risk of erroneous deprivation, and the State's interest in vesting certification decisions in the appropriate municipal registrar is substantial. The Law Court has said that

> [p]rocedural due process requires fundamental fairness, which involves consideration of three factors to assess whether the State has violated an individual's right to due process: [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute

17

procedural safeguards; and finally, the Government's interest, including the function involved and administrative burdens that the additional or substitute procedural requirement would entail.

*All. for Retired Ams. v. Sec'y of State*, 2020 ME 123, ¶ 30, 240 A.3d 45 (quoting *In re Child of Lacy H.*, 2019 ME 110, ¶ 14 n.3, 212 A.3d 320) (alterations in original).

It is beyond dispute that Petitioner has a cognizable "private interest" in seeking access to the presidential primary ballot. *See Nader v. Maine Democratic Party*, 2012 ME 57, ¶ 26, 41 A.3d 551, 560, *abrogated on other grounds by Gaudette v. Davis,* 2017 ME 86, 160 A.3d 1190 ("Restrictions on access to the ballot burden two distinct and fundamental rights, the right of individuals to associate for the advancement of political beliefs [under the First Amendment], and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." (alterations in original) (quotation marks omitted)). However, the risk of erroneous deprivation of such access is low provided that a candidate correctly follows the statutory procedures and guidance set forth by the Secretary. The deprivation occurred in this case not because the Secretary employed a faulty process, but because Petitioner did not separate petition forms by town, as instructed by the Secretary, or, in the alternative, give himself sufficient time to bring those multi-town signature sheets to the relevant municipalities before the November 20 deadline. *Cf. Dobson v. Dunlap*, 576 F. Supp. 2d 181, 191 (D. Me. 2008) ("The constitutional standard contemplates a reasonably diligent independent candidate, not a last-minute procrastinator."); *see also All. for Retired Ams.*, 2020 ME 123, ¶ 21, 240 A.3d 45 ("Reasonable regulation of elections . . . *does* require

18

[voters] to act in a timely fashion if they wish to express their views in the voting booth." (alterations and emphasis in original) (quotation marks omitted)).

In addition, the State's interest in permitting municipal registrars to certify the signatures of only those voters residing in their communities is significant. *See All. for Retired Ams.*, 2020 ME 123, ¶¶ 15, 19, 31, 240 A.3d 45. As the Secretary notes, registrars "perform a vital function" of ensuring that the names on a petition form comply with § 335(3)—that is, that each signature is genuine and belongs to someone registered to vote and enrolled in the candidate's party. Resp't's Br. 19. To perform this critical task, a registrar may need to compare an original signature on a petition form with the corresponding original voter registration application, which is kept by the town registrar. *See* 21-A M.R.S. § 172. The Secretary persuasively argues that the ability to compare original signatures is necessary for reliable certifications. *See Hammer*, 2010 ME 109, 8 A.3d 700, at App. n.7; *Hammer*, No. AP-09-007, 2010 WL 8495539, n.7 (Me. Super. Ct. Sept. 28, 2010) (noting that review of scanned petitions "could increase the potential for forged signature[s] and otherwise 'mask material alterations to a petition.'" (quoting the Secretary's brief)).

Moreover, municipal control over the voter rolls is central to the statutory voter registration scheme. Town registrars have the "exclusive power" to determine an applicant's eligibility to register, *id.* § 121; the duty to check marriage, death, change of name, and change of address records before printing a voting list prior to any election, *id.* § 128(1); and the obligation to keep registration information about municipal voters current in the state's central voter registration system, *id.* § 161(2-

19

A). And although registrars have access to this central system, by law they may only share information about voters in their own towns. *Id.* § 196-A(3). It stands to reason then, that the person tasked with managing a town's voter rolls is also best equipped to reliably certify signatures of voters from that town.

Finally, Petitioner's proposed alternative procedures—either that registrars certify signatures from other communities or circulate multi-town petitions to each relevant registrar—would negatively impact the reliability of the certification procedures and place unworkable administrative burdens on towns. *See All. for Retired Ams.*, 2020 ME 123, ¶¶ 15, 19, 31, 240 A.3d 45. For the reasons just discussed, a registrar in Town A is unlikely to have the necessary knowledge to reliably certify signatures of voters from Town B. And Petitioner's proposed town-to-town relay of original petition forms would turn an already expedited certification process into a frenzied race against the clock, leaving registrars without sufficient time to perform the actual verification process the statute requires.

In sum, the court concludes that the statutory requirement that registrars certify only the signatures of voters residing in their municipalities is not "a minor procedural requirement," as Petitioner argues (Pet. ¶ 65), but rather essential to maintaining election integrity, and that Petitioner's procedural due process rights have not been violated. *See All. for Retired Ams.*, 2020 ME 123, ¶ 15, 240 A.3d 45 ("'[a] State indisputably has a compelling interest in preserving the integrity of its election process'" (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)).

20

## B. *First and Fourteenth Amendments*

For similar reasons, Petitioner's federal due process challenge also fails. A candidate's challenge to the State's imposition of ballot access restrictions requires the court to balance competing interests. On the one hand, such restrictions implicate First and Fourteenth Amendment rights: "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters . . . to cast their votes effectively." *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983) (quotation marks omitted). On the other hand, the State has an interest in managing its elections, including by regulating ballot access. *See Purcell*, 549 U.S. at 4 ("A State indisputably has a compelling interest in preserving the integrity of its election process" (quotation marks omitted)); *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (noting that states "retain the power to regulate their own elections").

With these principles in mind, the Law Court has explained that the test for whether a particular ballot regulation passes constitutional muster is not necessarily strict scrutiny. Rather,

> a more flexible standard applies. A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the [petitioner] seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by the rule, taking into consideration the extent to which those interests make it necessary to burden the [petitioner's] rights.

*All. for Retired Ams.*, 2020 ME 123, ¶ 17, 240 A.3d 45 (quoting *Burdick*, 504 U.S. at 434); *see Jones*, 2020 ME 113, ¶¶ 20-21, 23-24, 238 A.3d 982. When a state election law "imposes only reasonable, nondiscriminatory restrictions" upon a candidate's

21

rights, "the State's important regulatory interests are generally sufficient to justify the restrictions." *All. for Retired Ams.*, 2020 ME 123, ¶ 17, 240 A.3d 45 (quoting *Burdick*, 504 U.S. at 434). "No bright line rule separates permissible election-related regulation from unconstitutional infringements." *Id.* (quoting *Purcell*, 549 U.S. at 5).

Here, the provisions of § 335, permitting registrars to certify within-jurisdiction signatures, are nondiscriminatory and impose only a modest burden on Petitioner's associational rights. As the Secretary notes, Maine law allows primary petitions to "contain as many separate papers as necessary." 21-A M.R.S. § 335(1). Thus, to comply with the statute's certification requirements, circulators need only carry enough blank petition forms to accommodate signatures from multiple towns. It is true, as Petitioner asserts (Pet. ¶ 72), that there is likely some added expense and time that comes with the additional step of submitting these multiple forms to different town offices prior to the statutory deadline, but there is nothing in the record to suggest that this extra work is particularly onerous. *See Jones*, 2020 ME 113, ¶ 30, 238 A.3d 982 (noting that the petitioner in a Rule 80C appeal carries the burden to show that an election regulation violates the Constitution). Thus, although the *effect* of the municipal certification requirement is severe in this case—Petitioner has not qualified for the primary ballot—the court cannot say that the *burden* the requirement imposes on Petitioner's constitutional rights is severe as applied. *See Jones*, 2020 ME 113, ¶ 31, 238 A.3d 982; *see also All. for Retired Ams.*, 2020 ME 123, ¶¶ 19-21, 240 A.3d 45 (interpreting election deadline statute and

22

observing that its "burden on the right to vote . . . [wa]s slight" even though enforcing the deadline could potentially preclude some voters from casting their ballots).

This minimal burden is weighed against the State's asserted interests, which are substantial. *See id.* ¶ 32. The Secretary argues, and Petitioner agrees (Pet. ¶ 73), that the State has an important interest in requiring candidates to demonstrate sufficient support from voters to gain access to the ballot. Resp't's Br. 20; *see Jenness v. Fortson*, 403 U.S. 431, 442 (1971) (recognizing the "important state interest in requiring [a candidate to make] some preliminary showing of a significant modicum of support" to be listed on a ballot). Petitioner further agrees with the Secretary that states must have some means of verifying the signatures offered in support of a person's candidacy. *See Hart v. Sec'y of State*, 1998 ME 189, ¶ 13, 715 A.2d 165 ("any interference with proponents' right to unfettered political expression is justified by the State's compelling state interest in protecting the integrity of the initiative process"); *see also All. for Retired Ams.*, 2020 ME 123, ¶ 15, 240 A.3d 45. The agreement breaks down regarding the constitutionality of insisting on a municipality-by-municipality certification process, which Petitioner contends does not actually advance the State's articulated goals. However, as discussed *supra* at pp. 19-20, the State has reasonably chosen to vest certification powers in the officials best positioned to make accurate determinations: local registrars responsible for maintaining voter lists.

The requirement at issue here therefore imposes only "reasonable, nondiscriminatory restrictions" on Petitioner's First and Fourteenth Amendment rights for the purpose of ensuring compliance with Maine's ballot access standards. *Jones*, 2020 ME 113, ¶ 34, 238 A.3d 982 (quoting *Burdick*, 504 U.S. at 434). The court accordingly concludes that the State's interest is sufficient to justify the restrictions placed on Petitioner's rights, and Petitioner has not satisfied his burden of overcoming the presumption of constitutionality. *See id.*

## IV. Substantial Compliance

Petitioner finally argues that even if he did not strictly comply with the letter of the law as set forth in § 335, he is nevertheless entitled to relief because he "substantially complied" with the statutory scheme. Pet. ¶¶ 78-84. Specifically, Petitioner argues that he achieved substantial compliance by turning in at least 3,142 signatures to municipal election officers for certification before the statutory deadline. Pet. ¶¶ 81-83. To support this contention, Petitioner directs the court to *McGee v. Sec'y of State*, 2006 ME 50, 896 A.2d 933.

In *McGee*, the petitioner argued that a statutory filing deadline governing initiative petitions was merely directory and that petitions could be accepted after that deadline "as long as they 'substantially complied' with constitutional and statutory requirements." *Id.* ¶¶ 13-14. Addressing this argument, the Law Court drew a distinction between a "directory" election statute, which tolerates "substantial compliance," and a "mandatory" election statute, which requires strict compliance and affords the Secretary no discretion. *Id.* ¶¶ 13, 16. The Law Court,

24

however, did not elaborate on what substantial compliance entails, as it concluded that the one-year statutory filing deadline at issue was "mandatory." *Id.* ¶¶ 14-17.

In reaching this conclusion, the *McGee* Court relied on two statutes setting forth rules of statutory construction, one of which, 21-A M.R.S. § 7, was "directly applicable to election laws." *Id.* ¶¶ 14-15 (citing 1 M.R.S. § 71(9-A)[6] and 21-A M.R.S. § 7). That provision states: "[w]hen used in this Title, the words 'shall' and 'must' are used in a mandatory sense to impose an obligation to act in the manner specified by the context." 21-A M.R.S. § 7. Thus, because "must" terminology was used in the challenged provision, the *McGee* Court determined that the statutory deadline was "mandatory" and gave "the Secretary no discretion or authority to accept late-filed petitions, no matter how substantially they may comply with other statutory or constitutional requirements." 2006 ME 50, ¶ 16, 896 A.2d 933.

In this case, the court declines to apply a "substantial compliance" standard. The Law Court in *McGee* only mentioned this principle in passing, having no occasion to explore or define what constitutes substantial compliance, and Petitioner has not pointed the court to any additional Law Court decisions interpreting such a standard. More fundamentally, § 335 "gives the Secretary no discretion or authority" to accept a signature that has not been certified by the registrar of the voter's respective municipality. *Id.* As discussed *supra* pp. 10-16,

---

[6] Title 1 M.R.S. § 71(9-A) states: "'Shall' and 'must' are terms of equal weight that indicate a mandatory duty, action or requirement."

25

§ 335(7)(B) states that the registrar "of each municipality concerned *shall* certify which names on a petition appear in the central voter registration system as registered and enrolled voters in that municipality and may not certify any names that do not satisfy subsection 3." 21-A M.R.S. § 335(7)(B) (emphasis added). And subsection 3 uses similar mandatory terminology: "The voter *must* personally sign that voter's name in such a manner as to satisfy the registrar of that voter's municipality that the voter is a registered voter and enrolled in the party named on the petition." *Id.* § 335(3).

As in *McGee*, the Legislature has used the terms "shall' and "must" to mandate the circumstances under which a signature is to be certified; the language affords no discretion to the Secretary to count signatures that have not been certified by the appropriate municipal registrar. *McGee*, 2006 ME 50, ¶¶ 14-17, 896 A.2d 933; 21-A M.R.S. § 7. Because §§ 335(3) and 335(7)(B) are couched in mandatory terms, any substantial compliance with other provisions of the statutory scheme does not excuse Petitioner's failure to submit the petition forms to the proper municipal election official for certification.

## CONCLUSION

Based on the foregoing, the Secretary's decision to reject Mr. Christie's primary petition is affirmed.

The clerk is directed to incorporate this order on the docket by reference pursuant to M.R. Civ. P. 79(a).

DATED: December 21, 2023

_____
Julia M. Lipez
Justice, Superior Court

27